**John J. MASCIO, Plaintiff–Appellee,**

v.

**PUBLIC EMPLOYEES RETIREMENT SYSTEM OF OHIO; Richard E. Schumacher, Defendants–Appellants.**

No. 97–3314.

United States Court of Appeals,
Sixth Circuit.

Argued June 11, 1998.

Decided Nov. 4, 1998.

Rehearing and Suggestion for Rehearing En Banc Denied Jan. 11, 1999.*

* Judge Rosen would grant rehearing for the reasons stated in his dissent.

Benson A. Wolman (argued and briefed), Wolman, Genshaft & Gellman, Columbus, OH, for Plaintiff–Appellee.

James M. Harrison, Asst. Atty. General (briefed), Office of Attorney General of Ohio, Columbus, OH, Jeffrey S. Sutton, State Solicitor (argued and briefed), Columbus, OH, for Defendants–Appellants.

Before: NELSON and RYAN, Circuit Judges; ROSEN, District Judge.*

DAVID A. NELSON, J., delivered the opinion of the court, in which RYAN, J., joined. ROSEN, D.J. (pp. 315–326), delivered a separate dissenting opinion.

## OPINION

DAVID A. NELSON, Circuit Judge.

This is an appeal from a preliminary injunction in which the district court barred the Public Employees Retirement System of Ohio and its Executive Director from enforcing a newly enacted Ohio statute that mandates forfeiture of certain vested pension rights. Finding no abuse of discretion, we shall affirm the injunction.

I

The plaintiff, Jefferson County Common Pleas Judge John Mascio, retired from the bench in September of 1996. On October 1, 1996, Ohio's Public Employees Retirement System (PERS) began paying him the retirement benefits to which he was entitled by law. Notwithstanding his retirement, Mascio stood as a candidate for election to the seat

---

* The Honorable Gerald Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

he had just vacated. Elected without opposition in November of 1996, he began receiving a salary upon his return to the bench in January of 1997.

Had it not been for what came to be perceived as a statutory loophole, this kind of "double-dipping" would have been impossible under Ohio law. At the time of Judge Mascio's retirement, the Ohio Revised Code contained a provision that read as follows:

"No person holding office in this state ... who is re-elected to that office shall retire under Chapter 145. of the Revised Code with a date for the commencement of his retirement allowance that is during the period beginning on the thirty-first day before the date of his re-election and extending through the thirty-first day after the date on which his new term of office begins." Ohio Rev.Code § 3.16(A) (repealed 12/6/96).

The consequence of retirement in violation of § 3.16(A) was forfeiture of the elected office. Ohio Rev.Code § 3.16(B).

Judge Mascio was able to plan his retirement and subsequent election in such a way as to avoid the application of § 3.16. Filing for re-election without making his retirement plans public, he secured a place on the ballot without attracting an opponent. His re-election assured, he retired with a date for commencement of his retirement allowance that was more than thirty-one days prior to the election.

After the election, in an eleventh-hour effort to prevent Judge Mascio from double-dipping, the Ohio legislature passed Senate Bill 82. The new act became effective on December 6, 1996—about a month before Judge Mascio was to resume his judicial duties, but more than two months after he had begun collecting his retirement benefits.

As codified at Ohio Rev.Code § 145.38(C)(4), the new legislation provides in part as follows:

"A PERS retirant shall elect division (C)(1)(b) of this section if both of the following apply:

(a) The retirant held elective office in this state, or in any municipal corporation, county, or other subdivision of this state at the time of retirement under Chapter 145. of the Revised Code;

(b) The retirant was elected or appointed to the same office for the remainder of the term or the term immediately following the term during which the retirement occurred."

Division (C)(1)(b) provides that the retirant will "receive compensation for the employment and forfeit the pension portion of the retirement allowance." The retirant is precluded from electing division (C)(1)(a), under which certain persons can receive "both compensation for the employment and a retirement allowance."

In light of the new statute, the Retirement System notified Judge Mascio that his retirement allowance would be suspended effective January 1, 1997. Mascio then brought the present declaratory judgment/injunction suit, claiming a violation of his rights under the Contract Clause (Art. I, § 10) and Bill of Attainder Clause (Art. I, § 9) of the United States Constitution. Concluding that Mascio had demonstrated a substantial likelihood of success on the merits of these claims, the district court granted a preliminary injunction blocking suspension of the retirement allowance. This appeal followed.

## II

■ The granting of a preliminary injunction is subject to appellate review under an "abuse of discretion" standard. The injunction will seldom be disturbed unless the district court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard. See *Blue Cross & Blue Shield Mut. of Ohio v. Blue Cross and Blue Shield Ass'n,* 110 F.3d 318, 322 (6th Cir.1997).

■ In exercising its discretion with respect to a motion for a preliminary injunction, a district court must give consideration to four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served

by issuance of the injunction." *Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir.1998).

■ In this circuit, "the four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met." *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985). This court "will reverse a district court's weighing and balancing of the equities only in the rarest of circumstances." *Moltan Co. v. Eagle–Picher Indus., Inc.*, 55 F.3d 1171, 1175 (6th Cir.1995).

■ In its balancing of the four factors in the case at bar, the district court placed great weight on the circumstance that, as the court saw it, Judge Mascio had shown a strong likelihood of success on the merits of both his Bill of Attainder and Contract Clause claims. We find it unnecessary to address the Bill of Attainder Clause question, because it seems to us that the district court was clearly correct in its assessment of the likelihood that Judge Mascio would prevail on the Contract Clause issue.

■ The Contract Clause provides that "[n]o state shall ... pass any ... Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl.1. To prove a violation of this provision, a plaintiff must demonstrate that a "change in state law has 'operated as a substantial impairment of a contractual relationship.'" *General Motors Corp. v. Romein*, 503 U.S. 181, 186, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992) (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978)). In deciding whether such a demonstration has

been made, the court must ask whether "(1) a contract exists, (2) a change in law impairs that contract, and (3) the impairment is substantial." *Linton v. Comm'r of Health & Environment*, 65 F.3d 508, 518 (6th Cir. 1995), *cert. denied*, 517 U.S. 1155, 116 S.Ct. 1542, 134 L.Ed.2d 646 (1996). If a contractual obligation is substantially impaired by the change in law, the court must further inquire whether the adjustment of the rights of the parties to the contractual relationship was reasonable and appropriate in the service of a legitimate and important public purpose. See *Allied Structural Steel*, 438 U.S. at 242–44, 98 S.Ct. 2716.

■ The retirement benefits of Ohio public employees vest, by statute, at the time when the retirement allowance or pension is granted by the public employees retirement board. Ohio Rev.Code § 145.561. The effect of this vested rights statute is "to make the engagement of public authorities to pay a pension, upon conditions fulfilled, a contractual obligation founded upon a valid consideration, giving to the pensioner a vested right in his pension which cannot afterwards be impaired or revoked." *State ex rel. Cunat v. Trustees of Cleveland Police Relief & Pension Fund*, 149 Ohio St. 477, 482, 79 N.E.2d 316 (1948), *supplemented*, 150 Ohio St. 377, 82 N.E.2d 743 (1948).

Judge Mascio's pension was fully vested as of October 1, 1996, the date on which he began receiving benefits. As of that date, in other words, Mascio had a contractual right to continued receipt of the benefits. Forfeiture of the benefits would obviously constitute a substantial impairment of this vested contract right.[1]

---

1. Our assessment of the substantiality of the impairment does not turn on our assessment of Judge Mascio's personal rectitude, of course. The dissent accuses Mascio of practicing "deliberate concealment and deceit" in order "to manipulate the retirement system to gain a windfall." If Judge Mascio held a vested contractual right to a pension, however, the abrogation of that right—either for a six year term or for life—constituted a substantial impairment of the contract whether or not our sensibilities happen to cringe at Mascio's cupidity and duplicity.

The dissent acknowledges that "as of October 1, 1996, the date on which his pension commenced, Judge Mascio possessed a vested right

to the continued receipt of retirement benefits." But because he took pains to conceal his plans, realizing that he might not win the election if his intent were to become known before the filing deadline, Mascio is said to have had no "legitimate" expectation of being able to continue receiving his retirement benefits if he won the upcoming election.

As a legal matter, it seems to us, the legitimacy of the expectation turns on the wording of the existing statutes and not on the moral legitimacy of Mascio's gamesmanship. The fact that we may find the gamesmanship repugnant surely gives us no warrant to rewrite the Ohio Revised Code—and neither can it warrant our gaming the Constitution itself by labeling as "insubstan-

The defendants argue that no impairment could occur unless, as of December 6, 1996, Mascio had a present right to receive both his pension and his judge's salary. We disagree. The newly enacted statute effected a forfeiture of pension benefits, not a forfeiture of salary. Although it is conceivable that under the new law Mascio could have continued to receive his pension benefits by resigning from the office to which he had been re-elected, his contractual right to the pension benefits was not conditioned on his giving up his judicial salary.

In reliance on a line of cases that includes *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983), the defendants attempt to justify the new statute as a "regulation" that has "a significant and legitimate public purpose." See *id.* at 411, 103 S.Ct. 697. Substantial impairment of Judge Mascio's vested contract rights is justified, according to the defendants, "by the state's significant and legitimate public purpose in passing S.B. 82: protecting the viability of the PERS retirement fund, maintaining public confidence in the fund, ending double-dipping schemes like these by elected officials, and protecting public confidence in the judiciary in general and in lawyers in particular."

Judge Mascio responds that these purposes will be served by the prospective application of the statute to all public employees whose pensions vest after enactment. It was unnecessary and unreasonable, Mascio submits, to pass the statute as an emergency measure targeted at him alone. (It appears that Mascio was the only Ohio official who took advantage of the statutory loophole in 1996.)

■ Where the State is a party to the contractual obligation in question, "complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake." *United States Trust Co. of New York v. New Jersey*, 431 U.S. 1, 26, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977). Moreover, "a state is not completely free to consider impairing the obligations of its own contracts on a par with other policy alternatives." *Id.* at 30–31, 97 S.Ct. 1505. We do not question the legitimacy of the purposes put forward by the defendants, but this does not mean that it was reasonable or necessary to bring Mascio within the ambit of a statute that was not enacted until after his pension had vested. The district court determined that impairment was "not necessary to advance an important public purpose" here. The defendants have pointed to nothing that persuades us otherwise.[2]

tial" an impairment of contract that is plainly not insubstantial.

2. From the State's point of view, as the dissent suggests, the political aspect of the forfeiture of Judge Mascio's pension has far more significance than the financial aspect. But what is small change to the State is not necessarily small change to the pensioner—and if any deference be due the State's decision to renege on its contract with Judge Mascio, we are not persuaded that the degree of deference should be increased because of the huge disparity between the wealth of the State and the wealth of the individual pensioner.

Neither are we persuaded that *Energy Reserves*—a decision harking back to *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934)—can legitimize the forfeiture of Judge Mascio's vested pension rights. *Energy Reserves* dealt with price controls imposed by the State of Kansas on the intrastate marketing of natural gas. The State was not a party to the contracts in question, and its interest was one of "controlling the serious economic dislocations that [a] sudden increase in gas prices would cause...." *Energy Reserves*, 459 U.S. at 409, 103 S.Ct. 697. Like the depression era mortgage moratorium that was upheld in *Blaisdell*, the Kansas statute addressed a "broad and general" socioeconomic problem. See *Energy Reserves*, 459 U.S. at 412, 103 S.Ct. 697. No such "broad and general" problem was addressed by the application of Senate Bill 82 to Judge Mascio. In this respect the Ohio statute resembles the Minnesota pension statute held unconstitutional in *Allied Structural Steel*. As the *Energy Reserves* Court said of the Minnesota statute, it had "a very narrow focus: it was aimed at specific employers" and "it even may have been directed at one particular employer...." *Energy Reserves*, 459 U.S. at 412 n. 13, 103 S.Ct. 697. The Ohio statute, similarly, may well have been directed at one particular Ohio employee—and Ohio's impairment of its own contract with Judge Mascio is even more clearly unconstitutional, as we see it, than was Minnesota's impairment of the private pension contracts in *Allied Structural Steel*.

Given the near certainty of Mascio's success on the merits of his Contract Clause claim, we find no abuse of discretion in the district court's issuance of the preliminary injunction. The order granting the injunction is **AFFIRMED**.

## DISSENT

ROSEN, District Judge, respectfully dissents.

### I.  *Introduction*

This case calls upon us to consider the role that Federal Courts should play in reviewing the constitutionality of actions undertaken by state lawmakers to protect the integrity of their own governmental institutions.  I would hold that the Ohio legislation is constitutional as it does not substantially impair a clearly vested contract right and, in any event, satisfies the significant and legitimate purpose exception to the Contracts Clause.  I would further hold that the legislation does not amount to a punishment of Plaintiff, and thus, does not violate the constitutional prohibition against bills of attainder.

In reaching this decision, I am mindful of the fact that courts owe great deference to the policy decisions of the Legislative and Executive Branches, and that Federal Courts owe particular deference to the decisions of state law makers who act to protect the integrity of their own governmental institutions against schemes by state public officials which erode public confidence in those institutions.  I believe that when Federal Courts tread unnecessarily upon the ability of state lawmakers to take such corrective action, they undermine the public's confidence in their own legitimacy.  Judge Mascio's conduct in this case reflected poorly on his character and clearly violated the spirit of the law.  In response, the Ohio legislative and executive branches acted reasonably and appropriately to correct this conduct and to preserve the integrity of its public institutions.  Absent a clear trespass of the Federal Constitution, which I do not believe exists here, it is not for this Federal Court to intrude.

### II. *Factual Background*

Although the majority's summary of the factual background of this case is broadly accurate, I believe a more detailed account is necessary to fully appreciate the mendacity of Plaintiff's conduct leading up to this action and the Ohio state government's legislative responses.

To understand the intent and purpose behind the legislation in question, it is important to consider the political and legislative context in which it was enacted.  Following the 1992 State of Ohio elections, several public officials who had won reelection immediately retired.  These officials intended to "unretire" at the beginning of their new term, and simultaneously collect retirement benefits and salary for the same position.  In an attempt to end this practice of "double-dipping," the Ohio General Assembly enacted H.B. 151 (Ohio Rev.Code § 3.16(A)).[1]  The legislation imposed a period lasting from 31 days prior to an election until the beginning of a new term during which elected officials could not retire in order to simultaneously collect retirement benefits and salary.  The violation of this provision resulted in the forfeiture of elected office under Ohio Rev. Code § 3.16(B).  Thus, in effect, the legislation forced officials to either forgo double-dipping or disclose their plans far enough in advance to allow the electorate to consider this and reflect its concerns when voting.

Some time thereafter, Plaintiff, Jefferson County Common Pleas Judge John Mascio, discovered a potential loophole that would allow an unopposed candidate to circumvent the outcome clearly intended by Ohio Rev. Code § 3.16(A).  On September 12, 1995, Judge Mascio wrote to the Ohio Public Employees Retirement System ("PERS") to inquire into the consequences of retiring more

---

1.  The bill provided in pertinent part:
    No person holding office in this state ... who is reelected to that office shall retire under Chapter 145, of the Revised Code with a date for the commencement of his retirement allowance that is during the period beginning on the thirty-first day before the date of his re-election and extending through the thirty-first day after the date on which his new term of office begins.
    Ohio Rev.Code § 3.16(A).

than 31 days prior to the upcoming election, and then returning to the same office on January 1, 1997. After discretely confirming the existence of the loophole, Judge Mascio filed a petition to run for reelection in 1996 without disclosing his retirement plans. He then embarked upon a deliberate effort to conceal his double-dipping scheme from the public in clear violation of the spirit of Ohio Rev.Code § 3.16(A)

The success of Judge Mascio's plan hinged upon his ability to keep his double-dipping scheme secret until at least September 16, 1996, the final filing date for opposition candidates. On August 21, 1996, Judge Mascio began quietly initiating his retirement. However, in a letter to PERS that same day, he stated that he did not want his retirement application processed at this time, and continued on to say: "Please do not send information to the fiscal officer of my county or to the Supreme Court until and unless you hear further from me." Judge Mascio subsequently informed PERS personnel to begin processing his application on September 16, 1996, with a retirement date of September 30, 1996.

After learning that no candidate had filed to oppose him, Judge Mascio disclosed his double-dipping plan to Ohio Governor George Voinovich and Ohio Supreme Court Chief Justice Thomas Moyer. In a September 17, 1997 letter to Chief Justice Moyer, Judge Mascio not only indicated his plan to "retire" and "unretire," thereby permitting him to double-dip, but he flaunted the system even further by requesting an interim appointment during the period of his supposed retirement:

> I am unopposed for re-election to my current position for a term beginning January 1, 1997 and will appear on the November Ballot as an unopposed candidate. I expect to resume my position as of January 1, 1997. Because of the brief period that this position would be vacant I doubt if the Governor would be able to find a qualified attorney in this county willing to assume this position for a three month period.
>
> I would be interested in meeting with you to discuss the feasibility of my being appointed by you as the Interim Judge.

Chief Judge Moyer rejected this possibility by letter, stating in pertinent part:

> Your retirement falls outside the time period set forth in R.C. 3.16, and you are not barred from being reelected and assuming office as a judge of the court of common pleas. However, your temporary retirement violates the spirit of House Bill 151. I am concerned it may further the perception of some that elected officials place personal interests ahead of the public interest. Under these circumstances, I will not assign you to the Jefferson County Court of Common Pleas during the period of the vacancy created by your resignation and will assign another judge if I am requested to make an assignment.

Chief Judge Moyer apparently faxed a copy of the letter to the media, setting off a firestorm of criticism of Judge Mascio.[2]

Despite this criticism, Judge Mascio proceeded with his plan and retired on September 30, 1996. On November 5, 1996, he was elected as an unopposed candidate to the term of Common Pleas Judge commencing January 1, 1997.

Following the election, the Ohio General Assembly acted quickly to thwart Judge Mascio's double-dipping plan by enacting Senate Bill 82, codified at Ohio Rev.Code § 145.38(C)(4), which provides:

(4)A PERS retirant shall elect division (C)(1)(b) of this section if both of the following apply:

---

**2.** Under the weight of public scrutiny, Judge Kerr, another Common Pleas Judge who initially joined in the double-dipping scheme, repudiated the plan. In a newspaper interview, Judge Kerr publicly thanked the media, the public, and Justice Moyer for raising the issue, stating:

"I think I made a mistake, and I'll admit it," Kerr said. "My integrity is more important to me than money."

"Most importantly, I wish to assure the public that the integrity of the judiciary is of paramount importance to me," he added. "I hope the public, my staff and members of the bar will accept my apology for tarnishing that image."

"I hope that my actions will redeem me in their eyes," Kerr said.

(a) The retirant held elective office in this state, or in any municipal corporation, county, or other subdivision of this state at the time of retirement under Chapter 145 of the Revised Code;

(b) The retirant was elected or appointed to the same office for the remainder of the term or the term immediately following the term during which the retirement occurred.

Under subsection (C)(1)(b), the retirant must "receive compensation for the employment and forfeit the pension portion of the retirement allowance."

The new legislation included an emergency provision making the substantive portions of the statute applicable immediately, rather than after the customary ninety-day waiting period.[3] Governor Voinovich quickly signed the Bill which became effective on December 6, 1996. PERS subsequently notified Judge Mascio it was suspending his retirement allowance effective January 1, 1997.

Judge Mascio then filed suit alleging violations of his rights under the Contract Clause and the Bill of Attainder Clause of the United States Constitution. The District Court granted a preliminary injunction blocking the suspension of Judge Mascio's retirement benefits after concluding that Plaintiff had demonstrated a substantial likelihood of success on the merits of both claims. Defendant appeals that ruling.

## III.  *Legal Analysis*

### A.  *Contract Clause Challenge*

Article I, § 10 of the United States Constitution provides, "No state shall ... pass any ... Law impairing the Obligation of Contracts." The Supreme Court has promulgated a three-part test for determining whether a law violates the Contract Clause:

> Generally, we first ask whether the change in state law has "operated as a substantial impairment of a contractual relationship."

*Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 244, 98 S.Ct. 2716, 2722, 57 L.Ed.2d 727 (1978); *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 411, 103 S.Ct. 697, 704, 74 L.Ed.2d 569 (1983). This inquiry has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial. *General Motors Corp. v. Romein,* 503 U.S. 181, 186, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992). *See also, Linton v. Commissioner of Health and Environment,* 65 F.3d 508, 518 (6th Cir.1995). If all three components are present, a state may nonetheless avoid enforcement of the Contract Clause if it can demonstrate "a significant and legitimate public purpose behind the regulation, such as the remedying of a broad and general social or economic problem." *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 411–412, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983) (citations omitted).

### 1.  *Substantial Impairment*

I concur in the majority's conclusion that the instant case satisfies the first two prongs of the three-part test for determining violations of the Contract Clause. As indicated by the majority, retirement benefits of Ohio public employees vest at the time when the retirement allowance or pension is granted by PERS. Ohio Rev.Code § 145.561. The effect of vesting is to impose a contractual obligation on the State to disburse retirement benefits. Thus, as of October 1, 1996, the date on which his pension commenced, Judge Mascio possessed a vested contract right to the continued receipt of retirement benefits. The new legislation impaired this right to receive benefits by making it conditional upon Plaintiff's actual retirement from his current position.

---

3. The emergency provision provided:

Section 7. This act is hereby declared an emergency measure necessary for the immediate preservation of the public peace, health, and safety. The reason for such necessity is the urgent desire of the people of Ohio to immediately remedy the situation where an elected official is permitted to retire during a term of office, be reelected or appointed to the same office, and receive both a retirement allowance and employment compensation during the new term of office. Therefore this act shall go into immediate effect.

I depart from the majority, however, as to whether this impairment rises to the level of being "substantial." When faced with a contract clause challenge, courts examine the legitimate expectations of the contracting parties "to determine whether the impairment complained of is 'substantial' as well as to determine its level of severity." *Maryland State Teachers Association, Inc. v. Hughes,* 594 F.Supp. 1353, 1360 (D.Md.1984) (citing *United States Trust Co.,* 431 U.S. at 19–20 n. 17, 97 S.Ct. 1505; *Spannaus,* 438 U.S. at 245–246, 98 S.Ct. 2716; *Energy Reserves Group, Inc. v. Kansas Power and Light Company,* 459 U.S. 400, 411, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983)). Although "[t]otal destruction of contractual expectations is not necessary for a finding of substantial impairment ... state regulation that restricts a party to gains it reasonably expected from the contract does not necessarily constitute a substantial impairment." *Energy Reserves Group,* 459 U.S. at 411, 103 S.Ct. at 704.

A public official cannot, or at least should not, legitimately expect to receive a windfall by simultaneously collecting retirement benefits and salary for the same position. This is especially true in the instant case given that the then existing law—which Judge Mascio so carefully connived to circumvent—was specifically enacted by the Ohio General Assembly to prevent such schemes. Judge Mascio had no entitlement to double-dip; to the contrary, he discovered a loophole which allowed him, through deliberate concealment and deceit, to manipulate the retirement system to gain a windfall. Indeed, Judge Mascio's own conduct reveals that even he viewed his plan to circumvent the intent of the law as anything but "legitimate." If Judge Mascio possessed a legitimate expectation of being able to double-dip, why then would he have gone to the great lengths he did to conceal his plans from the electorate and fellow public officials? In sum, Judge Mascio's only legitimate expectation was that which the law intended and every other public official shared: to receive a pension upon his actual retirement from his position. By

prohibiting double-dipping, the new legislation merely restricts Judge Mascio to the benefits he reasonably could have expected from his employment with the State. Viewed in this context, although Judge Mascio's machinations to circumvent the law may have given him an expectation of succeeding with his double-dipping scheme, this was an illegitimate, rather than a legitimate, expectation.

Furthermore, the majority overstates the actual impact of the law on Judge Mascio's retirement benefits. The bill does not force Judge Mascio to forfeit his entire pension, it simply requires him to wait until he actually retires to collect the benefits.[4] In essence, the statute presents Judge Mascio with an eminently reasonable choice: retire now and collect pension benefits or serve out the term under salary. In either case, he will eventually receive his pension when he actually ceases his employment as a common pleas judge. Accordingly, in light of Judge Mascio's legitimate expectations and the fact that the new legislation merely suspends the payment of retirement benefits until actual retirement, I would hold that the statute does not substantially impair Plaintiff's vested contract right.

### 2. *Significant and Legitimate Purpose Exception*

However, even assuming the law does substantially impair Judge Mascio's retirement contract, it still falls within the significant and legitimate purpose exception to the Contracts Clause. I begin with a jurisprudential point. The question presented here as to whether a statute that impairs a contract right does so in furtherance of a significant and legitimate purpose raises serious federalism and separation of powers issues, as it inherently requires Federal Courts to inquire, and perhaps intrude, into state legislative and policy decision making. Indeed, in order for a Federal Court to overturn a state statutory enactment over an argument that the statute was enacted to further a significant and legitimate state purpose, the Feder-

---

4. While Ohio Rev.Code § 145.38(C)(1)(b) does use the word "forfeit," it is clear that the statute as a whole merely suspends a person's retire-

ment allowance if they choose to return to their prior position.

al Court would, of necessity, have to second-guess the State Legislature and Executive and, in effect, substitute its own judgment for that of the State Legislature and Executive. I believe the Federal Courts should approach such second-guessing intrusion upon state lawmaking with great trepidation and great restraint, and only substitute its judgment where the state-asserted rationale behind a statute is clearly not substantial or legitimate.

I respectfully, but profoundly, disagree with the majority's finding that the state has not proffered a substantial and legitimate purpose for impairing Judge Mascio's contract right. To the contrary, I believe the state's interest in correcting the chicanery of state public officials and attempting to preserve and protect the perceived and actual integrity of public service is one of paramount importance in a democracy, and that Federal Courts should intrude themselves upon such efforts only in the most extreme of circumstances. This is particularly true where, as here, the State Legislature and Executive were responding to public outrage over such chicanery.

Beyond this general jurisprudential context, however, I believe the Ohio law in question here eminently satisfies constitutional precedent and passes muster. As noted, a State can avoid enforcement of the Contracts Clause if it demonstrates a significant and legitimate public purpose for a legislative act. *Energy Reserves, supra.* Once a significant and legitimate purpose is identified, the inquiry shifts to whether the legislation in question reasonably and appropriately furthers that purpose. *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 242–244, 98 S.Ct. 2716, 2721–2722, 57 L.Ed.2d 727 (1978). "Legislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption." *United States Trust Co. of New York v. New Jersey,* 431 U.S. 1, 22, 97 S.Ct. 1505, 1518, 52 L.Ed.2d 92 (1977).

In the instant case, the state identified numerous public purposes for the new legislation, including eliminating double-dipping schemes by elected officials and protecting public confidence in the integrity of the Ohio judiciary in general and public service in particular. *See, Energy Reserves,* 459 U.S. at 412, 103 S.Ct. 697 at 705, 74 L.Ed.2d 569 ( "One legitimate state interest is the elimination of windfall profits"). The majority concedes the legitimacy of the purposes identified, but argues that it was neither reasonable or necessary to bring Judge Mascio within the ambit of the statute by applying it immediately to prevent the success of his scheme. I disagree.

The majority's conclusion rests largely upon the principle that while courts generally should defer to legislative assessments of reasonableness and necessity, the state faces a higher burden when it is a party to a contract. "[C]omplete deference to a legislature's assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake." *United States Trust Co.,* 431 U.S. at 26, 97 S.Ct. at 1519; *See also, Energy Reserves,* 459 U.S. at 412–413, 103 S.Ct. at 705. The majority fails to recognize, however, that there are crucial distinctions between the present case and the facts and legal principles which underlie the *United States Trust Co.* decision; distinctions which should cause the Court to pause before substituting its own judgment of what is reasonable and appropriate for the citizens of Ohio for that of the Ohio Legislative and Executive branches.

In *United States Trust Co.,* the Supreme Court reviewed a 1974 New Jersey law which repealed a 1962 statutory covenant between New Jersey and New York that limited the ability of the Port Authority of New York and New Jersey to subsidize public transportation from revenues and reserves pledged as security for consolidated bonds issued by the Port Authority. The New Jersey legislature sought to repeal the covenant in order to subsidize rail passenger transportation through Port Authority revenues and reserves. The Supreme Court found that the outright repeal of the 1962 covenant totally eliminated an important security provision of bondholders, and thus impaired a state contractual obligation. While the Supreme Court recognized the state's legitimate and significant purpose of promoting public

transportation, the Court declined to defer to the legislature's judgment that repealing the 1962 covenant constituted a reasonable and appropriate method of promoting the state's proffered purpose:

> First, it cannot be said that total repeal of the covenant was essential; a less drastic modification would have permitted the contemplated plan without entirely removing the covenant's limitation on the use of Port Authority revenues and reserves to subsidize commuter railroads. Second, without modifying the covenant at all, the States could have adopted alternative means of achieving their twin goals of discouraging automobile use and improving mass transit.

*United States Trust Co.*, 431 U.S. at 29–30, 97 S.Ct. at 1521–1522. In sum, the Supreme Court found that by retroactively impairing a contract to which the state itself was a party, the New Jersey legislature greatly increased the risk to private bondholders that the state would not meet its own significant financial obligations. Because this impairment implicated the State's own financial self-interest, the Court refused to defer to the state's assessment of reasonableness and appropriateness and concluded that the 1974 law violated the Contracts Clause. Thus, it was in this self-interest context, wherein the State's impairment of the contract right begat a financial windfall for the State, that the Court found that the state faced a higher burden of defending its assessments of the reasonableness and necessity of the impairment and that complete deference was not appropriate.

That is simply not the case presented here. In contrast to *United States Trust Co.*, the state's financial interest in the present case is, at most, de minimis. Judge Mascio's pension constitutes an insignificant portion of the retirement fund as a whole, and the state stands to gain little or nothing financially by delaying his receipt of benefits until actual retirement.[5] Moreover, the extent of the contractual impairment in this case pales in comparison to the outright repeal of the 1962 statutory covenant in *United States Trust*

*Co.* The Ohio General Assembly did not eviscerate the State's contractual obligation to provide retirement benefits, but rather merely delayed Judge Mascio's pension until actual retirement. In a case such as this, which involves only a de minimis state financial interest and a marginal impairment of a state contractual obligation, legislative assessments of reasonableness and necessity are clearly entitled to some, if not substantial, deference. Indeed, the Supreme Court recognized in *United States Trust Co.* that "[t]he extent of impairment is certainly a relevant factor in determining its reasonableness." 431 U.S. at 27, 97 S.Ct. at 1520.

Quite simply, the self-interest of the state here is not a financial one. Rather the state's self-interest is in the preservation of the integrity of its judiciary and the public's confidence in public officials. I believe this is an eminently reasonable and necessary policy decision, and that the state was well justified in bringing Judge Mascio within the immediate ambit of the statute. In 1992, the Ohio Legislature enacted Ohio Rev.Code § 3.16(A), which required public officials to either forego double-dipping or disclose their plans to the public prior to an election. Rather than follow the clear intent and spirit of the law, Judge Mascio attempted to reap a windfall by secretly and deceitfully exploiting a loophole in the system. In response to this patently disingenuous conduct, the Ohio Legislature and Executive took immediate steps to remedy the defect in existing law and promote the state's firmly established public policy against double-dipping. Furthermore, the circumstances surrounding the passage of the new legislation demonstrate that Judge Mascio's conduct posed a real threat to the integrity of the judiciary. After months of deception, the public, the media, and fellow public officials responded with outrage upon finally learning of Judge Mascio's scheme. Supreme Court Chief Justice Moyer informed Judge Mascio that his conduct violated the spirit of existing law and would "further the perception of some that elected officials place personal interests ahead of the public interest." Similarly,

---

5. In point of fact, if Judge Mascio elected to serve out the remainder of his term, he would retire with more years of service and no doubt receive greater pension benefits.

Judge Mascio's colleague, Judge Kerr, who had intended to take advantage of the same loophole in the same fashion, withdrew from the scheme after recognizing that pursuing the plan would undermine public confidence in the judiciary. In repudiating the scheme, Judge Kerr apologized for tarnishing the image of the judiciary, and sought to assure the public that his own integrity and that of the judiciary were of paramount importance. In light of the public outrage over the scheme and the response of other state elected officials, the legislature could reasonably conclude that Judge Mascio's conduct posed a real threat to the integrity of the state judiciary. In response, the legislature took appropriate steps to thwart the scheme and effectuate the clear intent of existing law.

Nor would applying the statute prospectively only, as the majority suggests, have been a sufficient response, as this would have required the legislature to stand idly by as Judge Mascio undermined the credibility of the system he was elected to serve. Indeed, this would have been tantamount to a tacit acceptance of Judge Mascio's conduct. I suggest this would not have been viewed as a satisfactory response by the citizens of Ohio, and I do not believe it is the place of the Federal Courts to intervene post-hoc and second guess the considered judgment of the State's Legislature and Executive as to what measures are necessary to preserve the integrity of the state's own judiciary in particular and public officials in general. Therefore, I would hold that in passing the new statute and making it effective immediately, the legislature acted reasonably and appropriately to further the state's legitimate and critically important interest in preserving the perceived and actual integrity of the state's own governmental institutions. Accordingly, the statute falls within the significant and legitimate purpose exception to the Contracts Clause.

**6.** Article I, § 9, cl. 3 of the United States Constitution, contains a parallel provision applicable to the Federal Government which provides, "No Bill of Attainder or ex post facto Law shall be passed." For the purposes of analysis, the Court treats cases under either section as equally authoritative. *See e.g., Kerr–McGee Chemical Corp. v. Edgar*, 837 F.Supp. 927, 934 n. 6 (N.D.Ill. 1993) (court used the relevant precedents interchangeably because "the clauses are nearly identical, suggesting they are aimed at the same sort of legislative vice.").

### B.  *Bill of Attainder Challenge*

Because I would hold that the Ohio law does not violate the Contracts Clause, it is necessary to address Judge Mascio's claim that the statute, as applied to him through the bill's emergency clause, constitutes a bill of attainder.

Art. I, § 10 of the United States Constitution provides, "No State shall ... pass any Bill of Attainder." [6] A bill of attainder is a "law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Nixon v. Administrator of General Services*, 433 U.S. 425, 468, 97 S.Ct. 2777, 2803, 53 L.Ed.2d 867 (1977); *United States v. Lovett*, 328 U.S. 303, 315–316, 106 Ct.Cl. 856, 66 S.Ct. 1073, 1078–1079, 90 L.Ed. 1252 (1946). Thus, a bill of attainder requires three essential elements: specificity as to the target of the legislation, punishment, and the lack of a judicial trial. It is undisputed that the present case did not involve a judicial trial. Therefore, the following analysis focuses on the specificity and punishment requirements.

### 1.  *Specificity*

Generally, a legislative act satisfies the specificity requirement if it applies either to named individuals or to readily ascertainable members of a group. *Lovett*, 328 U.S. at 315, 66 S.Ct. at 1079. While bills of attainder have historically identified individuals by name, the Supreme Court has relaxed the requirement to include persons who are described in terms of their conduct. "The singling out of an individual for legislative prescribed punishment constitutes an attainder whether the individual is called by name or described in terms of conduct which, because it is past conduct, operates only as a designation of particular persons." *Selective Service System v. Minnesota Public Interest Research Group*, 468 U.S. 841, 847, 104 S.Ct. 3348, 3352, 82 L.Ed.2d 632 (1984) (*citing Communist Party of the United States v.*

*Subversive Activities Control Board,* 367 U.S. 1, 86, 81 S.Ct. 1357, 1405, 6 L.Ed.2d 625 (1961)).

Despite this seemingly straight forward test, the specificity requirement has proven difficult in application. In particular, two Supreme Court decisions, *Nixon* and *Selective Service,* appear to conflict with each other and have produced substantial confusion and divergent results in the area.

In the landmark case of *Nixon v. Administrator of General Services,* 433 U.S. 425, 470, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977), the Supreme Court held that an Act of Congress which expressly identified President Nixon by name, and applied not only prospectively to future Presidents but also retroactively to president Nixon, did not constitute a bill of attainder. After Nixon resigned as President, he executed a depository agreement with the Administrator of General Services that provided for the storage of documents and recordings accumulated during his tenure in office. The agreement included provisions that allowed Nixon to order the tapes destroyed after a certain period of time, and called for the destruction of all the tapes upon his death. In an attempt to abrogate the agreement, Congress enacted the Presidential Recordings and Materials Preservation Act, which directed the GSA Administrator to take custody of Nixon's materials. The Act directed government archivists to screen the materials in order to return to Nixon materials personal and private in nature, and to preserve and make available for use in judicial proceedings materials having historical value. Nixon argued that the specific provisions of the Act which applied only to him violated the Constitutional prohibition against bills of attainder.

In rejecting Nixon's claim, the Court stated, "[T]he mere specificity of [a] law does not call into play the Bill of Attainder Clause," *Nixon,* 433 U.S. at 471 n. 33, 97 S.Ct. 2777, in essence, reducing the bill of attainder analysis to a singular determination of whether the legislation in question constitutes a punishment:

> Appellant's characterization of the meaning of a bill of attainder obviously proves far too much. By arguing that an individual or defined group is attainted whenever he or it is compelled to bear burdens which the individual or group dislikes, appellant removes the anchor that ties the bill of attainder guarantee to realistic conceptions of classification and punishment. His view would cripple the very process of legislating, for any individual or group that is made the subject of adverse legislation can complain that the lawmakers could and should have defined the relevant affected class at a greater level of generality.

\* \* \* \*

Thus, in the present case, the Act's specificity[,] the fact that it refers to appellant by name[,] does not automatically offend the Bill of Attainder Clause. Indeed, viewed in context, the focus of the enactment can be fairly and rationally understood. It is true that Title I deals exclusively with appellant's papers. But Title II casts a wider net by establishing a special commission to study and recommend appropriate legislation regarding the preservation of the records of future Presidents and all other federal officials. In this light, Congress' action to preserve only appellant's records is easily explained by the fact that at the time of the Act's passage, only his materials demanded immediate attention. The Presidential papers of all former Presidents from Hoover to Johnson were already housed in functioning Presidential libraries. Congress had reason for concern solely with the preservation of appellant's materials, for he alone had entered into a depository agreement, the Nixon–Sampson agreement, which by its terms called for the destruction of certain of the materials. Indeed, as the federal appellees argue, "appellant's depository agreement . . . created an imminent danger that the tape recordings would be destroyed if appellant, who had contracted phlebitis, were to die." Brief for Federal Appellees 41. In short, appellant constituted a legitimate class of one, and this provides a basis for Congress' decision to proceed with dispatch with respect to his materials while accepting the status of his predecessors' papers

and ordering the further consideration of generalized standards to govern his successors.

*Nixon,* 433 U.S. at 470–472, 97 S.Ct. at 2804–2805. Thus, despite the Act's "surgical focus" on President Nixon, *BellSouth Corporation v. FCC,* 144 F.3d 58, 63–64 (D.C.Cir. 1998), the Court found that the specificity requirement was not satisfied.

In virtually direct contrast, the Supreme Court's most recent decision addressing the Bill of Attainder Clause, *Selective Service System v. Minnesota Public Interest Research Group,* 468 U.S. 841, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984), interpreted the specificity requirement broadly to include not only individuals specifically identified · by name, but those described in terms of conduct.[7] The *Selective Service* Court, with no attempt whatsoever to distinguish the *Nixon* Court's interpretation of the specificity requirement, indicated that "[w]hen past activity serves as a point of reference for the ascertainment of particular persons ineluctably designated by the legislature for punishment, the Act may be an attainder." *Selective Service,* 468 U.S. at 847, 104 S.Ct. at 3352 (internal citation omitted). Although the Court broadened the scope of the specificity definition, it nonetheless proceeded to hold that the denial of federal financial aid to male students who failed to register for the draft did not constitute a bill of attainder. In reconciling its broad definition of specificity with the particular facts of the legislation before it, the Court observed that, although the law singled out non-registrants and made them ineligible for aid based on their past conduct, it did not possess the requisite specificity because it gave non-registrants thirty days after receiving notice of ineligibility to register and qualify for aid. Thus, the Court rea-

soned that the law did not apply to past, irreversible actions, but turned upon a continuing contemporaneous fact which a student could correct. *Selective Service,* 468 U.S. at 851, 104 S.Ct. at 3354 (citing *Communist Party,* 367 U.S. at 87, 81 S.Ct. at 1406).

Faced with these apparently conflicting precedents, the United States Court of Appeals District of Columbia Circuit recently addressed a bill of attainder claim in *BellSouth,* 144 F.3d at 58, (D.C.Cir.1998). The Plaintiff in *BellSouth* argued that Section 274 of the Telecommunications Act of 1996, which limited the ability of Bell operating companies to enter the electronic publishing market, constituted a bill of attainder. In addressing the specificity requirement, the Court observed that "[s]ince virtually all legislation operates by identifying the characteristics of the class to be benefitted or burdened, it is not clear that the specificity requirement retains any real bite." *BellSouth,* 144 F.3d at 62–63. Despite the confusion surrounding the specificity requirement, the Court concluded that "it is obviously met here, since [the Act's] requirements apply uniquely to the twenty BOCs identified by name in the Act." *Id.* The Court then proceeded to focus its attention on the dispositive issue of whether the Act constituted a punishment of the Plaintiff.

Turning to the present case, while one could classify Judge Mascio as a "legitimate class of one" under *Nixon,* the common sense approach of *Selective Service* does seem more consistent with the intent of the Bill Attainder Clause.[8] Although the legislation in question does not mention Judge Mascio by name, it is analogous to the legislation in *BellSouth* in that the emergency clause probably applies uniquely to Judge Mascio.[9] The emergency provision obviously was added to

---

7. The legislation under review in *Selective Service* sought to deny federal financial aid to male students who failed to register for the draft. The statute gave non-registrants thirty days after receiving notice of ineligibility to register and qualify for aid.

8. It would be illogical to allow a legislature to avoid a finding of specificity by simply describing a targeted individual in terms of conduct rather than by name, thus permitting a law to do indirectly that which it could not do directly.

9. Although the legislation was clearly instigated by Judge Mascio's scheme, as far as the Ohio Legislature knew at the time it enacted the statute, the problem may have been more widespread. There may have been others who, either independently or in concert with Judge Mascio, intended to take advantage of the loophole, but when the firestorm of public outrage erupted, elected to quietly abandon their efforts.

ensure that the new statute applied to Judge Mascio in sufficient time to prevent him from succeeding with his double-dipping scheme. Following Judge Kerr's repudiation of the scheme, Judge Mascio was the only known person attempting to exploit the loophole in the prior statute. Moreover, the Ohio Legislature passed the Bill immediately after the election in response to the firestorm of media criticism of Judge Mascio. In sum, the circumstances surrounding the passage of the new legislation support the District Court's conclusion that Judge Mascio's conduct engendered the passage of the law.

Therefore, although the proposition is certainly not free from doubt—and under the *Nixon* definition the statute would unquestionably pass constitutional muster—I would hold that, consistent with the Supreme Court's standard for specificity in *Selective Service*, the Ohio statute describes Judge Mascio's conduct in terms sufficient to satisfy the specificity element of a bill of attainder.

### 2. *Punishment*

Regardless of the outcome under the specificity analysis, a legislative act must amount to a punishment to constitute a bill of attainder. Not every burden placed upon an individual by a legislative act constitutes punishment for purposes of the Bill of Attainder Clause. *Nixon*, 433 U.S. at 471–472, 97 S.Ct. at 2805–2806. The Supreme Court has formulated a three-part test for determining whether or not a statute constitutes a punishment. The test asks:

(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, "viewed in terms of the type and severity of burdens imposed, reasonably can be said to further non-punitive legislative purposes;" and (3) "whether the legislative record evinces a congressional intent to punish." *Nixon, supra,* 433 U.S. at 473, 475–476, 478, 97 S.Ct. at 2805, 2806–2807, 2808.

*Selective Service,* 468 U.S. at 852, 104 S.Ct. at 3355.

### a. *Historical Meaning of Legislative Punishment*

Historically, legislative punishments prohibited by the Bill of Attainder Clause included: death, imprisonment, banishment, confiscation of property, and legislative bars to participation by individuals or groups in specific employments or professions. *Selective Service,* 468 U.S. at 852, 104 S.Ct. at 3355. The District Court concluded that by forcing Judge Mascio to choose between his salary and his pension, the legislation combined "elements of two historic punishments: confiscation of property and denying an individual the opportunity to pursue a particular livelihood." This conclusion is clearly at odds with the facts presented here and the purpose of the statute.

In reality, the revised Ohio law did not deny either right, but simply prevented Judge Mascio from enjoying both simultaneously—which, of course, is what the then existing law that Judge Mascio was attempting to circumvent intended. A law that completely prohibited Judge Mascio from holding the office of common pleas judge would undoubtedly have inflicted historically prohibited punishment. Likewise, a legislative act that forfeited Plaintiff's entire pension absolutely would have amounted to punishment. The new legislation, however, simply forced Judge Mascio to choose between serving out his term under salary and then receiving his pension, or actually retiring and receiving the pension immediately. In either case, he was entitled to collect pension benefits when he actually retired. While this choice may have imposed a burden on Judge Mascio in that he was forced to defer his pension if he desired to continue to serve as a judge, it certainly does not fall within the historical meaning of punishment.[10]

A careful analysis of the *Selective Service* decision reveals precedential support for this conclusion. In *Selective Service*, the Supreme Court ruled that Congress did not subject individuals who failed to register for the draft to historically prohibited punishment by denying financial aid based on this

---

**10.** Of course, this is precisely what the then existing law was designed to accomplish, and it could hardly be claimed that Ohio Rev.Code 3.16(A) acted as a "punishment."

status. The Act in question gave students a choice: register for the draft and become eligible for financial aid, or fail to register and remain ineligible. The Supreme Court noted that, in contrast to "absolute barriers" such as disallowing people from entering into certain professions unless they filed loyalty oaths, the financial aid provision turned upon a "continuingly contemporaneous fact" which a student could correct. *Selective Service*, 468 U.S. at 851, 104 S.Ct. at 3354 (citing *Communist Party*, 367 U.S. at 87, 81 S.Ct. at 1406).[11]

Similarly, the revised Ohio statute does not erect absolute barriers to Judge Mascio holding his office or receiving his pension, but simply requires him to choose between the two, as he would have under the intent of the existing law. In equating this choice to a historically barred punishment, the District Court clearly erred.

### b. *Non–Punitive Legislative Purpose*

The District Court also erred in ruling that the new legislation did not further any non-punitive legislative purpose. As indicated above, Defendants identified numerous public purposes for the legislation, including eliminating double-dipping schemes by elected officials and preserving public confidence in the integrity of the Ohio judiciary. These purposes were clearly non-punitive.

Moreover, the District Court failed to recognize that the Ohio Legislature revised the law to close the unintended loophole left open by Ohio Rev.Code § 3.16(A). In passing that statute, the legislature clearly intended to force public officials who wished to double-dip to disclose their plains to the public prior to an election. Rather than further this intent, Judge Mascio chose to violate the spirit of the law by exploiting a loophole which allowed unopposed candidates to circumvent the disclosure provisions. In response, the Legislature acted to effectuate the original intent of Ohio Rev.Code § 3.16(A). This legitimate policy decision, in and of itself, constitutes a non-punitive purpose.

### c. *Intent to Punish*

Finally, the Court must apply a "motivational test" to determine whether the legislative history evinces an intent to punish. *Nixon*, 433 U.S. at 478, 97 S.Ct. at 2808. There is no legislative history per se for Ohio statutes. Therefore, the Court will look to the circumstances surrounding the passage of the new legislation, as well as the Bill itself, to determine motivation.

I agree with the District Court that the Ohio legislature passed the new law in response to a public outcry against Judge Mascio. I believe the District Court erred, however, in equating this response with an intent to punish. In point of fact, the actions of a single individual frequently draw attention to a particular problem and prompt a legislature to take immediate steps to rectify the situation. There is not necessarily a nexus, however, between that motivation and an intent to punish the individual. Rather, the motivation is an intent to correct an unintended shortcoming. Therefore, standing alone, the fact that Judge Mascio's conduct served as the impetus for enacting the new law does not expose a legislative plot to punish him.

In *Nixon*, the former President's actions served as the sole motivation behind the passage of a law to preserve the presidential papers and tapes from his term in office. Nonetheless, the Court found that Congress was not motivated by an intent to punish, but by their desire to preserve the availability of judicial evidence and of historically relevant materials. The legislative history surrounding the Act did not cast aspersions upon the former President, nor did it indicate that he was guilty of violating any law. The Court noted that this was in sharp contrast to *United States v. Lovett*, 328 U.S. at 312, 66 S.Ct. 1073, in which a House Report expressly characterized individuals as "subversive" and unfit to continue in Government employment, clearly showing an intent to punish. *Nixon*, 433 U.S. at 480, 97 S.Ct. at 2809.

Similar to the Supreme Court in *Nixon*, the Ohio General Assembly was not motivated by an intent to punish Judge Mascio, but

---

**11.** While the *Selective Service* Court actually employed this analysis in the specificity portion of the opinion, the rationale is equally applicable here.

by its desire to close a previously unforseen loophole in Ohio Rev.Code § 3.16(A). That law was clearly enacted to discourage the exact behavior engaged in by Judge Mascio. Thus, the actions taken to close the loophole merely effectuated the original intent of the statute. In addition, Judge Mascio was the only elected official seeking to exploit the loophole in Ohio Rev.Code § 3.16(A), and his conduct alone "demanded immediate attention." *Nixon,* 433 U.S. at 472, 97 S.Ct. at 2805. Accordingly, the circumstances surrounding the passage of the law do not reveal a legislative intent to punish Judge Mascio.

### IV. *Conclusion*

I would hold that the Ohio legislation is constitutional as it does not substantially impair a clearly vested contract right and, in any event, satisfies the significant and legitimate purpose exception to the Contracts Clause. I would further hold that the legislation does not amount to a punishment of Plaintiff, and thus, does not violate the constitutional prohibition against bills of attainder.