[Cite as *Youngstown City School Dist. Bd. of Edn. v. State* , 2017-Ohio-555.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

Youngstown City School District
Board of Education et al.,                  :

                                            :
        Plaintiffs-Appellants,
                                            :
                                                        No. 15AP-941
v.                                          :         (C.P.C. No. 15CV-7311)

                                            :
State of Ohio et al.,                                  (REGULAR CALENDAR)

                                            :
        Defendants-Appellees.
                                            :


D E C I S I O N

Rendered on February 16, 2017


**On brief:** *Roth, Blair, Roberts, Strasfeld & Lodge L.P.A., James E. Roberts, David S. Barbee, Christine Z. Papa*, and *Edward L. Ostrowski*, for appellant Youngstown City School District Board of Education; *AFSCME Ohio Council 8, AFL-CIO*, and *R. Sean Grayson*, for appellant AFSCME Ohio Council 8, AFL-CIO; *Green, Haines, Sgambati, Co., L.P.A., Ira J. Mirkin*, and *Charles W. Oldfield*, for appellants Youngstown Education Association, Ohio Education Association and Jane Haggerty. **Argued:** *Charles W. Oldfield*.

**On brief:** *Organ Cole LLP, Douglas R. Cole*, and *Carrie M. Lymanstall*, for appellee State of Ohio, Department of Education and Superintendent of Public Instruction Lonny Rivera. **Argued:** *Douglas R. Cole*.


APPEAL from the Franklin County Court of Common Pleas

BROWN, J.

{¶ 1} Plaintiffs-appellants Youngstown City School District Board of Education, AFSCME Ohio Council 8, AFL-CIO, Youngstown Education Association, Ohio Education Association, and Jane Haggerty, appeal from an order of the Franklin County Court of Common Pleas denying their motion for a preliminary injunction.

{¶ 2}   Appellants began this action with a complaint seeking declaratory judgment and challenging the constitutionality of 2015 Am.Sub.H.B. No. 70 ("H.B. No. 70"), enacted by the 131st General Assembly and effective October 15, 2015.   Although the merits of the action, as will be established below, are not yet before us, the legislation at issue amends Chapters 133, 3302, 3310, 3311, and 3314 of the Ohio Revised Code to grant broader powers to defendant-appellee, the State of Ohio, through defendants-appellees the Ohio Department of Education and the Superintendent of Public Instruction, to identify under performing public school systems and intervene to implement remedial measures.   Appellant Youngstown City School District, under the current standards, allegedly meets the negative criteria that would make it subject to appointment of an "academic distress commission" under the new provisions of R.C. 3302.10(A) and (B). That commission would then appoint a chief executive officer ("CEO") with operational, managerial, and instructional control of the district under R.C. 3301.10(C)(1).

{¶ 3}   After a two-day hearing, the trial court denied appellants' motion for a preliminary injunction on October 13, 2015, two days before H.B. No. 70 would go into effect.   The trial court determined that appellants had not established by clear and convincing evidence that they had a substantial likelihood of succeeding on the merits, that they would suffer irreparable injury in the absence of an injunction, that there was a grave risk to third parties if the state proceeded, and that an injunction was in the public interest.

{¶ 4}   Appellants have timely appealed from the trial court's denial of injunctive relief.  The matter is now before this court for an initial determination of whether the trial court's denial of temporary injunctive relief constitutes a final, appealable order that supports jurisdiction in this court.  We find that it does not, and dismiss the appeal.

{¶ 5}   Ohio appellate courts have jurisdiction to review only final, appealable orders of trial courts within their districts.  Ohio Constitution, Article IV, Section 3(B)(2); R.C. 2501.02.  In the absence of a final, appealable order, we lack jurisdiction and must dismiss the appeal.   *Prod. Credit Assn. v. Hedges*, 87 Ohio App.3d 207, 210 (4th Dist.1993), fn. 2.  Subject-matter jurisdiction may not be waived or bestowed upon a court by the parties to the case. *State v. Wilson*, 73 Ohio St.3d 40, 46 (1995).  As a result, an appellate court may raise the question of its subject-matter jurisdiction sua sponte before addressing the merits of an appeal.  *State ex rel. White v. Cuyahoga Metro. Hous. Auth.*,

79 Ohio St.3d 543, 544 (1997); *Noble v. Colwell*, 44 Ohio St.3d 92, 94 (1989); *see also Price v. Jillisky*, 10th Dist. No. 03AP-801, 2004-Ohio-1221 (courts have not only the authority but the duty to sua sponte examine an appeal for jurisdictional defects).

{¶ 6} A preliminary injunction is a provisional remedy, considered interlocutory, tentative, and impermanent in nature. *Wells Fargo Ins. Servs. USA v. Gingrich*, 12th Dist. No. CA2011-05-085, 2012-Ohio-677, ¶ 5. An order denying preliminary injunction does not, therefore, qualify as a final, appealable order unless it meets the two-part test set forth in R.C. 2505.02(B)(4) governing appeals from the grant or denial of provisional remedies: "(a) The order in effect determines the action with respect to the provisional remedy and prevents a judgment in the action in favor of the appealing party with respect to the provisional remedy," *and* "(b) The appealing party would not be afforded a meaningful or effective remedy by an appeal following final judgment as to all proceedings, issues, claims, and parties in the action."

{¶ 7} The first prong of the statute is satisfied in this case because the trial court has unequivocally denied appellants' request for a preliminary injunction. That order fully determined the action with respect to the provisional remedy and prevented a judgment in favor of appellants with respect to the requested injunctive relief. R.C. 2505.02(B)(4)(a). The remaining question, therefore, is "whether the denial of the preliminary injunction precludes a meaningful or effective remedy by an appeal following final judgment as to all proceedings, issues, claims, and parties in the action." *Ankrom v. Hageman*, 10th Dist. No. 06AP-735, 2007-Ohio-5092, ¶ 10.

{¶ 8} We lack jurisdiction in this matter because appellants have not established, pursuant to R.C. 2505.02(B)(4)(b), that they are deprived of a meaningful and effective remedy in an appeal at a later stage of the proceedings.

{¶ 9} The declaratory judgment action that is at the heart of this case will definitively address the constitutionality of H.B. No. 70. In the meantime, intervention in school district affairs by appellees under the provisions of H.B. No. 70 does not necessarily portend instantaneous, unilateral changes in school operations. The statute provides for a series of steps, beginning with the appointment within 30 days of an academic distress commission and designation of a chairperson by the state superintendent of public instruction. R.C. 3302.10(B)(1). Sixty days after selection of a chairperson, the commission is tasked with selecting and appointing a CEO for the school

district.    R.C. 3302.10(C)(1). While the CEO is vested with broad powers, R.C. 3302.10(C)(1)(a) through (q), the CEO is also required to meet with all community stakeholders, and develop expectations for academic improvement.  R.C. 3302.10(E)(1). The CEO will also consult with stakeholder groups to formulate an overall plan directing and improving the district's academic performance, which then is submitted to the commission, which will review and approve or modify the plan.  R.C. 3302.10(E)(2).

{¶ 10} Given the deliberate timeline encompassed by the legislation, the trial court's denial of a temporary injunction in this case does not leave appellants without recourse or effectively determine the action during the pendency of the trial court's consideration of the constitutionality of the legislation in the underlying declaratory judgment action. Denial of a provisional remedy in this case, particularly one considered interlocutory, tentative, and impermanent, does not meet the two-part test of R.C. 2505.02(B)(4)(a) and (b) for a final, appealable order.  We therefore sua sponte dismiss this appeal.

*Appeal dismissed.*

SADLER, J., concurs.
BRUNNER, J., dissents.

BRUNNER, J., dissenting.

{¶ 11} This decision results from our review of the decision of the Franklin County Court of Common Pleas denying preliminary injunction to plaintiffs-appellants, Youngstown City School District Board of Education, AFSCME Ohio Council 8, AFL-CIO, the Youngstown Education Association, and Jane Haggerty (collectively referred to as "Youngstown"), sought against defendants-appellees, the State of Ohio, the Ohio Department of Education, Superintendent of Public Instruction, and several individuals ("Ohio").  Youngstown sought an injunction against Ohio to stop it from implementing new legislation pending final outcome of the action that would permit Ohio to take over[1] Youngstown's responsibilities in educating the children of the Youngstown City School District until certain legislated changes are made.  This new legislation, Am.Sub.H.B. No.

---

[1] Language from the bill includes the following: "[t]he school year in which the transition period begins shall continue to apply and the chief executive officer shall work closely with the district board and district superintendent to increase their ability *to resume control of the district* and sustain the district's academic improvement over time."  (Emphasis added.)  R.C. 3302.10(N)(1).

70, was adopted by the 131st Ohio General Assembly on June 24, 2015.[2]  I respectfully dissent and would conclude that this Court has jurisdiction to hear Youngstown's appeal. I would further find that the trial court abused its discretion when it denied Youngstown's motion for preliminary injunction. Thus I would reverse the trial court's decision.

## I. FACTS AND PROCEDURAL HISTORY

### A. The Procedure in Adopting Am.Sub.H.B. No. 70

{¶ 12} While the majority briefly discussed the facts of the case before the trial court, more detailed discussion of the facts is helpful.  H.B. No. 70 was introduced in the Ohio House of Representatives ("House") and read for the first time on February 18, 2015. As introduced, the bill proposed to enact sections 3302.16, 3302.17, and 3302.18 of the Revised Code to generally authorize school districts and community schools to initiate a community learning center process to assist and guide school restructuring. H.B. No. 70 was read for a second time in the House on February 25, 2015, and it was referred to the House Education Committee.  The bill was reported out of committee and recommended for passage on May 6, 2015.  On May 19, H.B. No. 70 was reported out of committee, read for a third time, and passed by the House.  (Ex. 66, Sept. 29-30, 2015 Prelim. Inj. Hearing.)  H.B. No. 70 as passed by the House proposed the enactment of the three new sections of law concerning public education in Ohio and was ten pages in length.

{¶ 13} H.B. No. 70 was read into the journal of the Ohio Senate ("Senate") on May 20, 2015, having been referred to the Senate after the full House vote the previous day.  The bill was read into the journal of the Senate a second time on May 27, 2015, and referred to the Senate Education Committee through an order of reference.  Less than a month later, on June 24, 2015, the Senate Education Committee adopted a substitute H.B. No. 70 and reported it to the Senate Rules Committee for moving it to the Senate floor for a vote by the full Senate.  The Senate Education Committee had expanded H.B. No. 70 to amend several existing sections of the Revised Code; to enact additional new sections of the Revised Code; and to repeal an existing section of the Revised Code.  The Senate committee's changes caused H.B. No. 70 to become Sub.H.B. No. 70 and increased the bill's length from 10 pages to 77 pages.

---

[2]  The Act was signed by the governor on July 16, 2015, and became effective on October 15, 2015.

{¶ 14} Sub.H.B. No. 70 was read, amended,[3] voted on, and passed by the full Senate on June 24, 2015, the same day it was reported by the Senate Education Committee to the Senate Rules Committee and scheduled for a floor vote. The same day, Am.Sub.H.B. No. 70 was returned to the House for concurrence on Senate amendments. The House floor vote on Am.Sub.H.B. No. 70 also occurred on the same day and resulted in 55 members voting to concur in the Senate's changes and 40 voting against concurrence. The lead sponsor of H.B. No. 70 voted against the Senate changes to H.B. No. 70, and 24 of the 54 co-sponsors of the bill in the House withdrew their names as co-sponsors when the House concurred in Senate changes to H.B. No. 70. All of this occurred on one day, June 24, 2015. The governor signed Am.Sub.H.B. No. 70 on July 16, 2015.

**B. The Substantive Differences between H.B. No. 70 and Am.Sub.H.B. No. 70**

{¶ 15} As introduced and passed by the House, H.B. No. 70 proposed enacting three new sections in Ohio Revised Code Chapter 3302 so that, beginning with the 2015-2016 school year, any school district board of education or community school governing authority would be permitted to initiate the transition of any qualifying school building under its control into a "community learning center." The bill defined "community learning center" as a school or community school that "participates in a coordinated, community-based effort with community partners to provide comprehensive educational, developmental, family, and health services to students, families, and community members during school hours and hours in which school is not in session." H.B. No. 70 at 1. The bill provided that a school building meeting any of the following conditions was eligible for the community learning center process:

> 1. The building is in "improvement status," as defined by the "No Child Left Behind Act of 2001" or under an agreement between the Ohio department of education and the United States secretary of education.
>
> 2. The building is a secondary school that is among the lowest achieving fifteen percent of secondary schools statewide, as determined by the department [of education].

---

[3] The full Senate adopted two floor amendments to the bill before it was approved with a vote of 18 yeas and 14 nays.

3. The building is a secondary school with a graduation rate of sixty percent or lower for three or more consecutive years.

4. The building is a school that the department [of education] determines is persistently low-performing.

5. A school building is not in improvement status but for which the school district board of education or community school governing authority approves the operation of the school as a community learning center.

H.B. No. 70 at 2-3.

{¶ 16} The House version of H.B. No. 70 prescribed procedural steps for initiating the community learning center process, including holding public information hearings and conducting an election among: (1) parents or guardians of students enrolled in the building, (2) parents or guardians of students entitled to attend school in the building but who are enrolled in a different school operated by a joint vocational school district, and (3) teachers and non-teaching employees assigned to the building. In the event that a community learning center process for a building were initiated, H.B. No. 70 provided for the creation of a 12-member school action team comprised of parents or guardians of students enrolled in school at the building, community members who are not teachers or non-teaching employees, and teachers and non-teaching employees assigned to the school building. The school action team would be responsible for carrying out certain duties relating to monitoring and assisting in the community learning center implementation, as well as monitoring progress related to academic achievement.

{¶ 17} When the Senate Education Committee reported out a substitute version of H.B. No. 70, it retained the three sections of law that applied to all school districts of the state as proposed by the original House version of H.B. No. 70. It also expanded the bill's original community learning center model to include any school building where parents supported the change through a voting process. But the committee also used H.B. No. 70 as a means to approach the collective test performance of students of the Youngstown City School District through other provisions of the substitute bill that cause a drastic restructuring of the Youngstown City School District. The substitute bill proposed repealing existing R.C. 3302.10 (effective Sept. 17, 2014), which provided for a state-appointed academic distress commission, and the enactment of a new R.C. 3302.10 (effective Oct. 15, 2015), which sets new standards for the academic distress commission

and expands its powers. The new R.C. 3302.10 requires that the state superintendent of public instruction establish a five-member academic distress commission for any school district that meets one of the following conditions:

> (1) The district has received an overall grade of "F" under division (C)(3) of section 3302.03 of the Revised Code for three consecutive years.
>
> (2) An academic distress commission established for the district under former section 3302.10 of the Revised Code was still in existence on the effective date of this section and has been in existence for at least four years.

R.C. 3302.10(A)(1) and (2).

{¶ 18} There was evidence heard at trial that numerous school districts had received an "F" letter grade for having failed to meet state-required standards for the 2013-2014 school year. (Ex. 25 at 10-14.) However, the Youngstown City School District is the only school district in the state of Ohio that fit the condition contained in R.C. 3302.10(A)(2) of having an academic distress commission as previously defined in the law as of October 15, 2015 for at least four years. Under the language of the bill, Youngstown was the only school district in the state that could be subject to the new condition of R.C. 3302.10(A)(2), since the old commission format was being dissolved under the bill and a new one formed. R.C. 3302.10(B)(2). ("In the case of a school district that meets the condition in division (A)(2) of this section, the academic distress commission established for the district under former section 3302.10 of the Revised Code shall be abolished and a new academic distress commission shall be appointed for the district pursuant to division (B)(1) of this section.") And if an "improvement coordinator"[4] was previously appointed in the school district, the bill provides for that individual's termination through termination of the position, but permits that that individual may be hired for other positions by the new chief executive officer ("CEO") created under the bill. R.C. 3302.10(C)(2).

---

[4] Under R.C. 3302.04(A)(2), an "improvement coordinator's" job is to "to coordinate the district's academic improvement efforts and to build support among the community for those efforts."

{¶ 19} The bill's new five-member academic distress commission is comprised of: three members appointed by the state superintendent, one of whom is a resident of the county in which a majority of the district's territory is located; one member appointed by the president of the district board of education who must be a teacher employed by the district; and one member appointed by the mayor of the municipality in which a majority of the district's territory is located or, if no such municipality exists, by the mayor of a municipality selected by the state superintendent in which the district has territory. R.C. 3302.10(B)(1)(a) through (c).

{¶ 20} The substitute bill requires the new academic distress commission for the Youngstown City School District to appoint an individual having high-level management experience in the public or private sector as CEO. R.C. 3302.10(C)(1). The CEO has complete operational, managerial, and instructional control of the district, is paid by the Ohio Department of Education, and serves at the pleasure of the commission. *Id.* The CEO may delegate any functions to the superintendent or board of education of the Youngstown City School District, but he or she does not have to, and may control all aspects of district operation. The bill specifically enumerates the CEO's powers, but it does not limit them. The enumerated CEO powers effectively replace the duties and responsibilities of the elected board of education and of its superintendent in the following areas:

(a) Replacing school administrators and central office staff;

(b) Assigning employees to schools and approving transfers;

(c) Hiring new employees;

(d) Defining employee responsibilities and job descriptions;

(e) Establishing employee compensation;

(f) Allocating teacher class loads;

(g) Conducting employee evaluations;

(h) Making reductions in staff under section 3319.17, 3319.171, or 3319.172 of the Revised Code;

(i) Setting the school calendar;

(j) Creating a budget for the district;

(k)  Contracting for services for the district;

(l)  Modifying policies and procedures established by the district board;

(m)  Establishing grade configurations of schools;

(n)  Determining the school curriculum;

(o)  Selecting instructional materials and assessments;

(p)  Setting class sizes;

(q)  Providing for staff professional development.

R.C. 3302.10(C)(1)(a) through (g).  The Senate version of the bill further provides that the academic distress commission, in consultation with the state superintendent and the CEO, is responsible for expanding high-quality school choice options in the district, including attracting schools not operated by the district, using an independent accelerator formed by the commission in consultation with the state school superintendent and not subject to the authority of the CEO.  R.C. 3302.10(D).

{¶ 21} The CEO described by Am.Sub.H.B. No. 70 has enumerated powers, subject to the approval of the commission, to "reconstitute any school operated by the district," including replacing school building staff, contracting with outside nonprofit and for-profit entities to manage and staff the school, changing the focus of the school's curriculum, permanently closing a school, and reopening negotiations for existing collective bargaining contracts, the latter being done in consultation with the chair of the commission.  R.C. 3302.10(H)(1).

{¶ 22} To begin operations under the new law, the CEO for the Youngstown City School District must, within 30 days after his or her appointment, convene a group of community stakeholders, including educators, civic and business leaders, and representatives of institutions of higher education and government service agencies.  R.C. 3302.10(E)(1).   The purpose of the group is "to develop expectations for academic improvement in the district and to assist the district in building relationships with organizations in the community that can provide needed services to students."  *Id.*  Within 90 days after the CEO's appointment, he or she is also required to convene a smaller group of community stakeholders for each school operated by the district to develop

expectations for academic improvement in that school. The stakeholder group for each school must include teachers employed at the school and parents of students enrolled in the school. *Id.* The CEO is required to create, in consultation with the groups of stakeholders, a plan to improve the district's academic performance and to implement the approved plan in each school year that the district is in academic distress pursuant to the new R.C. 3302.10. R.C. 3302.10(E)(2).

{¶ 23} Am.Sub.H.B. No. 70 authorizes the appointment of a new board of education for the Youngstown City School District in accordance with newly enacted R.C. 3302.11, characterized in the bill as a district receiving an overall grade of less than "C" in each of the first four years it is placed in academic distress. The mayor of the appropriate municipality appoints a five-member board of education for the district from a slate of candidates nominated by a panel that is appointed by the state board of education and chaired by the state superintendent as a nonvoting member according to detailed guidelines as they exist in the bill. At the general election held in the first even-numbered year occurring at least three years after the district's academic distress commission ceases to exist, a referendum election must be held to determine if the mayor shall continue to appoint the district board of education. At the general election, the following question must be submitted to the electors of the district: "[s]hall the mayor of (here insert the name of the applicable municipal corporation) continue to appoint the members of the board of education of the (here insert the name of the school district to which this section applies)?" R.C.3302.11(G)(1). R.C. 3302.11 sets forth the procedures to be followed based on the outcome of the referendum election.

{¶ 24} Am.Sub.H.B. No. 70 also sets forth criteria and procedures for a district to transition out of academic distress. When the transition period is completed, the CEO relinquishes control of the district to the district board and district superintendent, and the academic distress commission ceases to exist. R.C. 3302.10(N). The commission also may cease to exist if no more schools exist in the district, having been reconstituted so as not to be operated by the district any longer (such as privately operated) or having been closed. R.C. 3302.10(O).

### C. The Litigation About the Legislation

{¶ 25} On August 21, 2015, Youngstown filed a complaint for declaratory judgment and an application for preliminary injunction in the trial court. Youngstown

simultaneously filed a motion for preliminary injunction and request for evidentiary hearing, seeking to enjoin Ohio from establishing an academic distress commission as set forth in Am.Sub.H.B. No. 70. Youngstown asserted three constitutional challenges to Am.Sub.H.B. No. 70 in its motion for preliminary injunction. Youngstown argued that the manner in which the General Assembly adopted Am.Sub.H.B. No. 70 violated the three-reading rule set forth in Article II, Section 15(C) of the Ohio Constitution. Second, Youngstown argued that Am.Sub.H.B. No. 70 violates Article VI, Section 3 of the Ohio Constitution because it eliminates all power of an elected school board and allows an unelected CEO to eliminate every school within a city school district, thus eliminating the right for electors in a city school district to determine the organization and number of members of the city school district board of education. Third, Youngstown argued that Am.Sub.H.B. No. 70 violates the Equal Protection Clauses of the United States and Ohio Constitutions and unconstitutionally infringes the fundamental right to vote because the Act eliminates all power conferred by the school district electors on an elected board of education and grants that power to an unelected CEO.

{¶ 26} On September 15, 2015, Ohio filed a memorandum in opposition to Youngstown's motion for preliminary injunction. On September 22, 2015, Youngstown filed a reply memorandum in support of its motion for preliminary injunction. On September 23, 2015, Ohio filed a motion to dismiss Youngstown's complaint, to which Youngstown responded on October 7, 2015.

{¶ 27} The trial court held an evidentiary hearing on Youngstown's motion on September 29 and 30, 2015, at which the parties presented evidence and arguments. More than 1600 pages of exhibits, including transcriptions of legislative public deliberations, were identified and admitted during the trial court's hearing on preliminary injunction. On October 13, 2015, the trial court entered judgment denying Youngstown's motion for preliminary injunction, having found that Youngstown had failed to prove by clear and convincing evidence each of the four factors required for a preliminary injunction.

{¶ 28} Am.Sub.H.B. No. 70 became effective on October 15, 2015. On October 14, 2015, Youngstown filed its notice of appeal and filed a motion for injunction pending appeal with this Court. This Court denied that motion on October 29, 2015.

## II. JURISDICTION

{¶ 29} The threshold question before this Court is whether the trial court's order denying temporary injunctive relief in this case is a final, appealable order over which this Court has jurisdiction. The majority concludes it is not such a final, appealable order. Respectfully, I would conclude that it is.

{¶ 30} During the pendency of our review of this appeal, this panel of judges was selected to hear the appeal of the companion cases *Electronic Classroom of Tomorrow v. Ohio Dept. of Edn.*, 10th Dist. No. 16AP-692, and *Electronic Classroom of Tomorrow v. Ohio Dept. of Edn.*, 10th Dist. No. 16AP-695 (taken together, "*ECOT*"), which had been heard and decided by the same trial court judge who heard this case now under review. The trial court in *ECOT* had similarly denied appellants' motions for a restraining order and preliminary injunctive relief. And, as in this case, the trial court found that ECOT had not established a substantial likelihood of success on the merits, had not demonstrated the likelihood of immediate and irreparable harm, loss, or damage that would result to ECOT or ECOT families in the absence of an injunction, had not demonstrated the imminence of harm to third parties, and could not demonstrate the injunction would serve the public interest.

{¶ 31} In *ECOT,* this panel found in a 2-1 decision that the order appealed was not a final, appealable order. There is the existence of a tangential mention of our jurisdiction by one of the parties herein. Regardless of whether raised by any party, I agree with the majority that it is incumbent on the Court to ascertain its jurisdiction on review of any matter. *State ex rel. White v. Cuyahoga Metro. Hous. Auth.*, 79 Ohio St.3d 543, 544 (1997); *Noble v. Coldwell*, 44 Ohio St.3d 92, 94 (1989), fn. 1. *See also Price v. Jillinsky*, 10th Dist. No. 03AP-801, 2004-Ohio-1221 (courts have not only the authority but the duty to sua sponte examine an appeal for jurisdictional defects).

{¶ 32} I also agree with the majority that Ohio appellate courts have jurisdiction to review only final, appealable orders of trial courts within their districts. Ohio Constitution, Article IV, Section 3(B)(2); R.C. 2501.02. If the underlying order is not a final, appealable order, the appellate court lacks jurisdiction and must dismiss the appeal. *Production Credit Assn. v. Hedges*, 87 Ohio App.3d 207 (4th Dist.1993).

{¶ 33} Finally, I agree with the majority that a preliminary injunction is a provisional remedy, considered interlocutory, tentative, and impermanent in nature.

*Wells Fargo Ins. Servs. USA v. Gingrich*, 12th Dist. No. CA2011-05-085, 2012-Ohio-677, ¶ 5. An order denying preliminary injunction does not, therefore, qualify as a final, appealable order unless it meets the two-part test set forth in R.C. 2505.02(B)(4)(a) and (b) governing appeals from the grant or denial of provisional remedies:

> (a) The order in effect determines the action with respect to the provisional remedy and prevents a judgment in the action in favor of the appealing party with respect to the provisional remedy.

> (b) The appealing party would not be afforded a meaningful or effective remedy by an appeal following final judgment as to all proceedings, issues, claims, and parties in the action.

{¶ 34} The record in *ECOT* arguably showed that ECOT had meaningful and effective administrative and judicial remedies absent this Court's review of the denial of preliminary injunction. The parties in that case acknowledged the trial court had before it a motion for a permanent injunction, which the trial court refused to determine based on the pendency of the then-current appeal having deprived it of jurisdiction. More importantly, there was no dispute as to the existence of an R.C. 3314.08(K)(2) administrative appeal process before the state board of education that provided further review and potentially an avenue of legal relief for ECOT, absent review of the trial court's decision on preliminary injunction.

{¶ 35} Because this administrative appeal process existed, ECOT arguably could not satisfy the second part of the test of R.C. 2505.02(B)(4), that it would not be afforded a meaningful or effective remedy by an appeal following final judgment as to all proceedings, issues, claims, and parties in the action. The statutorily provided R.C. 3314.08(K)(2) administrative review proceeding through the Ohio Department of Education available to ECOT had not yet begun and was undetermined, making our review of the trial court's denial of preliminary injunction, at best, review of a provisional remedy that was not so final or permanent as to effectuate jurisdiction for appellate review. Accordingly, a majority of this panel issued an entry dismissing ECOT's appeals for lack of jurisdiction.

{¶ 36} Analyzing Youngstown's action according to the statute on jurisdiction, the first prong, R.C. 2505.02(B)(4)(a), is satisfied in this case because the trial court has clearly denied Youngstown's request for a preliminary injunction. That order fully

determined the action with respect to the provisional remedy sought and prevented a judgment in favor of Youngstown with respect to preliminary injunctive relief. R.C. 2505.02(B)(4)(a).

{¶ 37} The determination of our jurisdiction, as in *ECOT*, turns on whether Youngstown has been denied a meaningful remedy in the absence of an immediate appeal. R.C. 2505.02(B)(4)(b).

> R.C. 2505.02(B)(4)(b) requires a determination of whether the denial of the preliminary injunction precludes a meaningful or effective remedy by an appeal following *final* judgment as to all proceedings, issues, claims, and parties in the action.

(Emphasis added.) *Ankrom v. Hageman*, 10th Dist. No. 06AP-735, 2007-Ohio-5092, ¶ 10. In determining this question, this Court has previously held, "we do not construe R.C. 2505.02(B)(4)(b) to require the absence of every theoretical remedy in order to find that appellant would be denied a 'meaningful' or 'effective' remedy following final judgment." *Bob Krihwan Pontiac-GMC Truck, Inc. v. GMC*, 141 Ohio App.3d 777, 781 (10th Dist.2001). Thus, it is the appellate court's charge to examine and determine whether there exists a meaningful or effective remedy, not the absence of any theoretical remedy that may at some point exist.

{¶ 38} In contrast to *ECOT*, the trial court's order in Youngstown's case does meet both of the two requirements of R.C. 2505.02(B)(4). The series of steps in the legislatively mandated process cited by the majority are not appeals or opportunities for redress; they are steps prescribed by a legislative process that may take time, but many are for all intents and purposes irreversible. These steps in the new law do not provide any meaningful or effective remedy by an appeal following final judgment as to *all* proceedings, issues, claims, and *parties* in the action. For example, if teachers are fired and school buildings are closed, or students assigned to private, charter schools or even schools outside the district, there is no remedy by appeal to undo such drastic changes that affect real people and their families. Injunction preserves such a remedy.

{¶ 39} Youngstown seeks relief from a newly enacted statute that it contends was unconstitutionally adopted. The crucial distinction between ECOT and Youngstown is that ECOT sought relief from an action of the Ohio Department of Education for which there was the potential for administrative appellate relief. No such arguably meaningful

or effective remedy exists for Youngstown following final judgment, absent review of the trial court's denial of preliminary injunction.

{¶ 40} Evidence adduced at the trial court's hearing on preliminary injunction supports this, showing that relief after final judgment as to all proceedings, issues, claims, and parties in the action will be virtually meaningless or nonexistent. The record includes testimony that the CEO's improvement plan to take place under Am.Sub.H.B. No. 70 has the potential to "disrupt progress just beginning to come to fruition after years of effort" and will "result in significant job loss and the closure of all or part of the public school system." (Youngstown's Amended Brief at 36.)

{¶ 41} Youngstown presented evidence to the trial court about harm to the district if Am.Sub.H.B. No. 70 is later declared to be unconstitutional, comparing the district's situation to a rock rolling down hill: one cannot start pushing that rock back up the hill until it stops going down. Youngstown stressed that the damage would be irreparable, stating, "[i]f you give away schools, if you fire people, how do you take that back?" (Sept. 29, 2015 Tr. Vol. I at 373.) The interim superintendent testified to the changes permitted to the school district by the bill and likened undoing the implementation of Am.Sub.H.B. No. 70 to "put[ting] the toothpaste back in the tube" – a universal nearly impossible task. *Id.* With the ability of the CEO to fire teachers and to close and consolidate schools, and even to change curriculum and contract to private parties the operation of some or all of the schools, denying review of the trial court's decision on preliminary injunction denies "fashion[ing] a remedy which would replace a potential loss of business goodwill, or repair business relationships with third parties such as creditors and suppliers." *Krihwan* at 781.

{¶ 42} And there is the question of harm to the students of the district, argued by both Youngstown and Ohio. Under Am.Sub.H.B. No. 70, the newly empowered CEO for the schools in Youngstown can undertake dramatic changes to the school district's operations (firing teachers,[5] closing and consolidating schools, changing curriculum and contracting to private parties schools' operations). The CEO is empowered to generally

---

[5] Youngstown also offered evidence of greater harm to students in part because of what the CEO could do to the district's teachers. The record contains trial court testimony about the effects of the bill's disruption to teachers and their classrooms and how it affects the district's students: "We need to be stable again so that teachers can teach, they can do their jobs and the students can grasp what's being taught." (Tr. Vol. I at 277.)

upend the operation of the current educational schema in the school district to the point that it cannot effectively change course to ensure that students, who do not stop growing or matriculating toward graduation, would not be irreparably harmed. The bill contains a specific provisional remedy in the form of a local election in contemplation that the CEO may not be successful. But any such remedy provided by Am.Sub.H.B. No. 70 is years down the road and itself subject to final judgment on the bill's constitutionality. If Youngstown proves the statute is unconstitutional, any such statutorily provided remedy will no longer exist.

{¶ 43} The trial court's order in this case meets the requirements of R.C. 2505.02(B)(4)(b) because Youngstown has established that it is deprived of a meaningful and effective remedy if it is unable to prosecute this appeal. Youngstown seeks an order effectively preserving the status quo until the constitutionality of Am.Sub.H.B. No. 70 is determined with finality. The question of the bill's constitutionality is one that should be undertaken with serious study and given due time for full consideration. Without our review of the trial court's order on preliminary injunction, Youngstown could suffer irreparable harm that cannot be remedied on final adjudication. Accordingly, I would find jurisdiction to review Youngstown's appeal and would reverse the trial court for abuse of discretion as explained below.

## III. ASSIGNMENTS OF ERROR

{¶ 44} Youngstown appeals from the trial court's judgment denying its motion for preliminary injunction, assigning four errors for this Court's review:

> 1. The trial court erred in finding that Plaintiffs-Appellants are not likely to succeed on the merits of their claims.
>
> 2. The trial court erred in finding that Plaintiffs-Appellants will not suffer irreparable harm without the requested injunctive relief.
>
> 3. The trial court erred in finding that third parties would be harmed by the requested relief.
>
> 4. The trial court erred in finding that the public interest will not be served by the requested injunctive relief.

## IV. DISCUSSION

### A. Standard of Review

{¶ 45} "An injunction is an extraordinary remedy in equity where there is no adequate remedy available at law. It is not available as a right but may be granted by a court if it is necessary to prevent a future wrong that the law cannot." *Garono v. State*, 37 Ohio St.3d 171, 173 (1988), citing *Sternberg v. Bd. of Trustees*, 37 Ohio St.2d 115, 118 (1974); *State ex rel. Pressley, v. Indus. Comm.*, 11 Ohio St.2d 141, 153 (1967); *Perkins v. Quaker City*, 165 Ohio St. 120, 125 (1956); and *Salem Iron Co. v. Hyland*, 74 Ohio St. 160, 167 (1906). "The grant or denial of an injunction is solely within the trial court's discretion and, therefore, a reviewing court should not disturb the judgment of the trial court absent a showing of a clear abuse of discretion." *Garono* at 173*,* citing *Perkins* at 125. However, " 'no court has the authority, within its discretion, to commit an error of law.' " *JPMorgan Chase Bank, N.A. v. Liggins*, 10th Dist. No. 15AP-242, 2016-Ohio-3528, ¶ 18, quoting *State v. Akbari*, 10th Dist. No. 13AP-319, 2013-Ohio-5709, ¶ 7, citing *State v. Beechler*, 2d Dist. No. 09-CA-54, 2010-Ohio-1900, ¶ 70. To the extent that the trial court made legal determinations in reaching its decision on the motion for preliminary injunction, this Court's review of the trial court's decision is plenary, and it undertakes a de novo review of its judgment to that extent. Youngstown has argued:

> [I]n this case the trial court's conclusion that [Youngstown] did not demonstrate a substantial likelihood of success on the merits turned on questions of law; i.e., whether the General Assembly complied with the Three Reading Rule when it passed H.B. 70 and whether H.B. 70 violated other constitutional provisions. Because the conclusion that [Youngstown] failed to demonstrate a substantial likelihood of success on the merits presented questions of law, this Court reviews that portion of the trial court's judgment de novo. See *City of St. Mary's v. Auglaize Cnty. Bd. of Commn.,* 115 Ohio St.3d 387, 392, 875 N.E.2d 561, 2007-Ohio-5026, ¶38; *W. Branch Local Sch. Dist. Bd. of Edn. v. W. Branch Edn. Assn.,* 2015-Ohio-2753, ¶¶ 1-2.

(Youngstown's Amended Brief at 15.)

{¶ 46} Youngstown argues further that its claims of constitutional violations are subject to strict judicial scrutiny:

> There is no fundamental right to an elected school board. That is, a legislature may provide for an elected or appointed school board. However, in *Kramer v. Union Free School Dist. No. 15*, 395 U.S. 621 (1969), the United States Supreme Court recognized that, once the legislature has provided for an elected school board, the right to vote for that school board is a fundamental right[.]
>
> * * *
>
> Ohio has granted voters the right to elect a school board. Because that decision has been made, H.B. 70 is subject to "exacting judicial scrutiny" because it disturbs that franchise. [*Kramer* at 628-29].

(Youngstown's Amended Brief at 31-32.)

{¶ 47} Ohio counters that, "while questions of statutory interpretation may be reviewed de novo, *see State v. Consilio*, 114 Ohio St.3d 295, 297 (2007), the factual findings underlying those determinations are reviewed for abuse of discretion, *see Americare Healthcare Servs., LLC v. Akabuaku*, 2013-Ohio-3013, ¶ 9 (10th Dist.) " (Ohio's Brief at 23.) Ohio asserts that Youngstown's "central claim focuses on whether H.B. No. 70 was 'vitally altered' by Senate amendments." *Id.* Ohio further asserts that Youngstown argued in the trial court that factual evidence was "relevant" in order to decide the merits of its claims. *Id.* at 24. Ohio argues that, "[h]aving argued below that facts matter to the merits of [its] constitutional claims, [Youngstown] must now concede that abuse of discretion applies to all four preliminary injunction factors." *Id.* at 24.

{¶ 48} Such a review involves mixed questions of fact and law, and therefore, once it has been determined that the trial court acted within its discretion in determining facts relevant to its legal determinations, a de novo review of certain questions of law decided by the trial court is in order. By analogy, in *Liggins* this Court discussed mixed questions of fact and law as it relates to a review of trial court decisions on whether to admit hearsay:

> [Q]uestions about whether to admit hearsay often are hybrid questions of fact and law. As such, they are based upon the fact-judging abilities of the trial court and are reviewed for abuse of discretion. *Pontius* [*v. Riverside Radiology & Interventional Assoc.*, 10th Dist. No. 15AP-906, 2016-Ohio-1515, ¶ 15]; *Thomas* [*v. Columbia Sussex Corp.*, 10th Dist. No. 10AP-93, 2011-Ohio-17, ¶ 17-18.] * * * In *Pontius*, for example,

> the trial court's abject failure to analyze the applicable hearsay exception in deciding to exclude testimony, constituted an error of law and, thus, an abuse of discretion. *Id.* at ¶ 23-24.

*Liggins* at ¶ 18. Similarly, when reviewing a trial court's decision on a question of law, such as whether a contract exists, there is also a mixed question of fact and law. *DeHoff v. Veterinary Hosp. Operations of Cent. Ohio, Inc.*, 10th Dist. No. 02AP-454, 2003-Ohio-3334, ¶ 49.

> "An appellate court may freely review application of the law to the facts. [citation omitted] It must, however, show deference to the factual findings made by the trial court. Where there are factual disputes, it is generally the province of the trial court to resolve those disputes by weighing credibility of the proffered testimony."

(Citations omitted.) *DeHoff* at ¶ 49, quoting *Rudd v. Online Resources, Inc.*, 2d Dist. No. 17500 (June 18, 1999). In the context of a motion to suppress, another context of mixed questions of law and fact, "the trial court assumes the role of the trier of fact and, is therefore, in the best position to resolve factual questions and evaluate witness credibility." *State v. Parsley*, 10th Dist. No. 09AP-612, 2010-Ohio-1689, ¶ 8, citing *State v. Curry*, 95 Ohio App.3d 93, 96 (8th Dist.1994). On review, the appellate court accepts the trial court's findings of fact so long as "they are supported by competent, credible evidence." *State v. Guysinger*, 86 Ohio App.3d 592, 594 (4th Dist.1993). The appellate court reviews "the trial court's legal conclusions based on those facts" showing no deference to its legal conclusions, since it is the appellate court's duty on review to determine " 'whether as a matter of law, the facts meet the appropriate legal standard.' " *Parsley* at ¶ 8, quoting *Curry* at 96.

{¶ 49} Other jurisdictions also have treated preliminary injunction review as one of a mixed question of law and fact whereby reversal occurs only if the decision " 'is the product of an abuse of discretion or misplaced reliance on an erroneous legal premise.' " *Uncle B's Bakery, Inc. v. O'Rourke*, 920 F.Supp.1405, 1422 (N.D.Iowa 1996), quoting *Timber Lake v. Cheyenne River Sioux Tribe*, 10 F.3d 554, 556 (8th Cir.1993), *cert. denied*, 512 U.S. 1236 (1994). More recently, the United States Sixth Circuit Court of Appeals has stated:

> While the ultimate decision to grant or deny a preliminary injunction is reviewed for an abuse of discretion, we review

the district court's legal conclusions de novo and *its factual findings for clear error. Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 233 (6th Cir. 2011). "This standard of review is 'highly deferential' to the district court's decision." Id. (quoting *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 541 (6th Cir. 2007)). "The injunction will seldom be disturbed unless the district court relied upon clearly erroneous findings of fact, *improperly applied the governing law*, or used an erroneous legal standard." *Mascio v. Pub. Emps. Ret. Sys. of Ohio*, 160 F.3d 310, 312 (6th Cir. 1998).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008). The district court's determination that a plaintiff is likely to succeed on the merits is a question of law that we review de novo. *Hunter*, 635 F.3d at 233.

(Emphasis added.) *Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir.2012).

{¶ 50} Ohio law governing preliminary injunction requires that, in determining whether to grant a preliminary injunction, a court must consider four factors: "1) whether there is a substantial likelihood that plaintiff will prevail on the merits; 2) whether plaintiff will suffer irreparable injury if the injunction is not granted; 3) whether third parties will be unjustifiably harmed if the injunction is granted; and 4) whether the public interest will be served by the injunction." *Vanguard Transp. Sys., Inc. v. Edwards Transfer & Storage Co.*, 109 Ohio App.3d 786, 790 (10th Dist.1996), citing *Valco Cincinnati, Inc. v. N & D Machining Serv., Inc.,* 24 Ohio St.3d 41 (1986). A party seeking a preliminary injunction has the burden of establishing a right to the preliminary injunction by demonstrating clear and convincing evidence of each of these factors. *Hydrofarm, Inc., v. Ordendorff*, 180 Ohio App.3d 339, 2008-Ohio-6819, ¶ 18 (10th Dist.), citing *Vanguard Transp. Sys., Inc.* at 790. In determining whether to grant injunctive relief, no one of the four preliminary injunction factors is dispositive; rather, a balancing should be applied. *Escape Enters., Ltd., v. Gosh Enters., Inc.,* 10th Dist. No. 04AP-834, 2005-Ohio-2637, ¶ 48, quoting *Cleveland v. Cleveland Elec. Illum. Co.*, 115 Ohio App.3d 1, 14 (8th Dist.1996).

**B. First Assignment of Error**

{¶ 51} Youngstown contends that the trial court erred in finding that it is not likely to succeed on the merits of its claims. Youngstown asserts three constitutional challenges to Am.Sub.H.B. No. 70. First, Youngstown claims that the General Assembly violated the three-reading rule set forth in Article II, Section 15(C) of the Ohio Constitution in enacting Am.Sub.H.B. No. 70. Second, Youngstown claims that Am.Sub.H.B. No. 70 violates Article VI, Section 3 of the Ohio Constitution because it infringes on the right of electors of the school district to determine the number and organization of the board of education. Third, Youngstown claims that Am.Sub.H.B. No. 70 violates the Equal Protection Clauses of the United States and Ohio Constitutions, and Article V, Section 1 of the Ohio Constitution because it denies Youngstown school district electors the right to vote or dilutes or nullifies the electors' votes. I would consider first the three-reading rule.

**1. Three-Reading Rule**

{¶ 52} Youngstown argues that the trial court erred in finding that the General Assembly considered H.B. No. 70 on three different days in each chamber according to Article II, Section 15(C) of the Ohio Constitution. Youngstown argues that the trial court's legal determination on the facts heard at the two-day hearing is in error and that the General Assembly did violate this "three-reading rule." *Id.* I would agree.

{¶ 53} Article II, Section 15(C) of the Ohio Constitution provides that "[e]very bill shall be considered by each house on three different days, unless two-thirds of the members elected to the house in which it is pending suspend this requirement, and every individual consideration of a bill or action suspending the requirement shall be recorded in the journal of the respective house." Youngstown asserts that the General Assembly violated this provision in adopting Am.Sub.H.B. No. 70 because the version passed by the Senate had "vitally altered" the substance of H.B. No. 70 as it had been passed by the House, and thus was required to be read three additional times in each chamber.

{¶ 54} With respect to the three-reading rule, the Supreme Court of Ohio has held that "a legislative Act is valid if the requisite entries are made in the legislative journals and there is no indication that the *subject matter of the original bill was 'vitally altered'* such that there is no longer a common purpose or relationship between the original bill and the bill as amended." (Emphasis sic.) *State ex rel. AFL-CIO v. Voinovich*, 69 Ohio St.3d 225, 233 (1994). In *Voinovich*, the court discussed and amplified its prior decision

in *Hoover v. Bd. of Cty. Commrs.*, 19 Ohio St.3d 1 (1985). The facts in *Hoover* involved legislation that was introduced and read three times in the Senate, but a House committee stripped the original language from the bill and substituted completely different content. Because the final version of the bill had not been read three times in the Senate, the *Hoover* court held that the plaintiffs stated a claim for a violation of the three-reading rule. *Voinovich* at 232, citing *Hoover* at 5. By contrast, the *Voinovich* court concluded that the legislation at issue had been heavily amended in both chambers of the General Assembly and by a conference committee, and it held that the final version as passed by both chambers retained its common purpose with the earlier versions read in each chamber. *Id.* at 234.

{¶ 55} The Supreme Court found in *Voinovich* that the bill at issue (unlike in *Hoover*) had not been "vitally altered" and thus did not violate the three-reading rule. *See also ComTech Sys., Inc. v. Limbach*, 59 Ohio St.3d 96 (1991) (holding that an amendment imposing sales tax on automatic data processing and computer services did not vitally alter an appropriations bill because "[r]aising and spending revenue are at the heart of an appropriations bill; adding a new taxable transaction does not vitally alter this scheme"). In so holding, the *Voinovich* court acknowledged both the importance of legislative consideration according to the three-reading rule and judicial deference to such legislative consideration:

> The difference between a valid bill that is heavily amended, however, and an invalid one that is "vitally altered," as relators would have us interpret that phrase, is one of degree. Section 15(A), Article II of the Ohio Constitution reserves to each house the right to freely alter, amend or reject bills introduced by either. This court would be setting dangerous and impracticable precedent if it undertook a duty to police any such difference of degree.
>
> Instead, we must look to the underlying purpose of the three-consideration provision. As articulated by Justice Douglas in his concurring opinion in *Hoover*, "the purpose of the 'three reading rule' is to prevent hasty action and to lessen the danger of ill-advised amendment at the last moment. The rule provides time for more publicity and greater discussion and affords each legislator an opportunity to study the proposed legislation, communicate with his or her constituents, note the comments of the press and become sensitive to public

opinion." *Id.*, 19 Ohio St.3d at 8, 19 OBR at 7, 482 N.E.2d at 582 (Douglas, J., concurring).

\* \* \*

Based on the foregoing, we decline to extend the *Hoover* analysis to the bill before us and declare the bill unconstitutional. To do otherwise would place this court in the position of directly policing every detail of the legislative amendment process when bills are passed containing a consistent theme.

*Voinovich* at 233-34.

{¶ 56} Relying on *Voinovich,* this Court subsequently, in a 2-1 decision in 2014, rejected a three-reading challenge in *Linndale v. State*, 10th Dist. No. 14AP-21, 2014-Ohio-4024, *appeal not accepted*, 142 Ohio St.3d 1464, 2015-Ohio-1896, *reconsideration denied*, 142 Ohio St.3d 1464, 2015-Ohio-1896, concerning the enactment of H.B. No. 606 in 2012.  The dissent offered a dim view of the facts in that case that are strikingly similar to the facts here, with a rightly placed focus on the importance of process to complying with the state constitutional mandate of Article II, Section 15(C) of the Ohio Constitution.

As stated in *Voinovich*, the purpose of the three-reading rule is to provide time for publicity, discussion, and an opportunity for legislators to study the legislation and confer on the issues. Instead, it appears from this record that the process undertaken to enact the mayors-court provision, one that affects every Ohio municipal corporation with populations of 200 persons or less thereby eliminating some mayor's courts in their entirety, was not only swift but also unanticipated.

*Linndale* (Sadler, J., dissenting at ¶ 7).  It is for this reason I would agree with Youngstown in its arguments concerning the three-reading rule.

{¶ 57} In *Linndale,* H.B. No. 606 as introduced and originally passed by the House made a single change to R.C. 1901.08, reducing the number of full-time judges on the Youngstown Municipal Court by one. The Senate amended H.B. No. 606 to eliminate certain mayor's courts and to clarify the effect of state and municipal measures prohibiting texting while driving.  The House voted to concur in the Senate amendments. *Linndale* at ¶ 2.  The constitutionality of H.B. No. 606 was challenged on multiple grounds, one of which was that it violated the three-reading rule.  A two-judge majority of this Court rejected the three-reading argument, finding that the two versions of H.B. No.

606 "shared a common relationship," namely "regulating the organization and structure of Ohio's statutory courts."   *Linndale* at ¶ 22.   That majority, relying on factual circumstances involving no record of objections in floor debate to the bill's changes, opined that the legislative process provides a fail-safe for ensuring sufficient consideration of amendments.  The majority in *Linndale* stated:

> [T]he third version of the bill considered by the full Senate contained the mayor's-court amendment. At this time, members of the Senate could have moved that the amendment be stripped or otherwise altered. They did not. The Senate passed the version of the bill with the amendment. Because this version was different from the version passed by the House, it was returned to the House for further consideration. At this time, members of the House could have moved that the amendment be stripped or otherwise altered. They did not. The House concurred with the version containing the amendment, thereby foregoing the opportunity to further consider and debate the bill in a conference committee. Both the Senate and the House had opportunities to consider the version of the bill with the mayor's-court amendment consistent with the purpose of the three-reading requirement.

*Id.* at ¶ 23.

{¶ 58} In the case under review, the trial court made factual findings that showed that more opposition was shown to Am.Sub.H.B. No. 70 than was shown in the case of H.B. No. 606, the subject of *Linndale.*  In doing so, however, the trial court misconstrued as "an opportunity to study and debate amended HB 70," a state senator's moving to "recommit the bill to the Senate Education Committee," "two Legislators testify[ing] that [they learned the night before that] there might be an amendment to HB 70 and were able to obtain copies of the amendments the night before it went to the Senate Education Committee" and "24 Legislators show[ing] their non support for Am. Sub. HB 70 by taking their names off of the bill."  (Oct. 13, 2015 Decision & Entry at 8-9.)  As a matter of law under the standards set forth in *Hoover, Voinovich*, and *Linndale,* while avoiding "policing every detail of the legislative amendment process," the trial court erred as a matter of law in finding that the three-reading rule was not violated and that Youngstown had not shown by clear and convincing evidence its likelihood of success on the merits. *Voinovich* at 234.

{¶ 59} *Linndale* presents strikingly similar circumstances to Youngstown, except the General Assembly cut it even closer in Youngstown's case than it did in *Linndale.* The trial court record shows that there was, in fact, an uproar by legislators who opposed the swift, cut-and-dried process undertaken, less than one year after our *Linndale* decision was released. Representative Denise Driehaus, who had introduced H.B. No. 70 in the House, urged the members of the House not to concur in the Senate's amendments to the bill and summarized how the process to which H.B. No. 70 had been subjected stymied the procedural safeguards of the three-reading rule:

> REP. DRIEHAUS: This is House Bill 70, as passed by the house. This is House Bill 70. I love this bill. This is a transformational bill. People have turned their lives around in Cincinnati because of this model. This is our bill. Most you voted for this bill, a whole bunch of you put your name on it. It's a good bill. I've been working on this bill for four years.
>
> Some of you have come down to Cincinnati, some of you have come to Oyler. I've heard nothing but rave reviews about Oyler and the model, and I thank you for coming. It meant a lot over the four-year period.
>
> About 24 hours ago, though, I was asked to meet with the Ohio Department of Education. I didn't know why we were meeting. I even asked my aide, call them, what are we meeting -- is it the budget? Is it the community learning -- what is it? What are we meeting about? I would like to be prepared.
>
> I couldn't get that information about what the meeting was about. So I went to the meeting, and they told me they're going to offer an amendment to House Bill 70 over on the Senate side. I said okay. What's the purpose of the amendment? Could I get the language of the amendment?
>
> What's the hurry on the amendment and why my bill? What are we doing -- we've got a budget rolling through right now. We've got other bills rolling through right now. Really? I don't know anything about this. Why House Bill 70? I got incomplete answers to all of those questions.
>
> So it turns out that this amendment is the antithesis of House Bill 70. House Bill 70 is about a groundswell of support for something in a community where you engage the community, the parents, the teachers, the community at large. That's what -- that's what the model is all about. Without that, there is no

model. It's about community engagement; it's about collaboration. The amendment turns the bill on its head.

The amendment is about Youngstown and every other community that's going to go into academic distress, by the way. This isn't just Youngstown. This will come to any community that has this distress commission. So this is a statewide policy.

And it talks about a process where a CEO is put in place, hired by five people, three of whom are chosen by somebody here in Columbus, and that person has ultimate authority over the school district.

Eventually, according to this amendment, from my read, the entire school district could be dismantled under this amendment by way of the CEO. And I am not exaggerating. That's what the language says. And it's a top down approach to schools, to school districts. That is not what House Bill 70's about. It's the opposite of what House Bill 70's about.

So we need to address the issues in Youngstown. I agree. I don't know that much about the distress commission nor do I know that much about the trials and tribulations over the last four years in Youngstown. We need to address what's going on in Youngstown, I agree. Let's work on it. Let's take our time. Let's do it together. Let's create some good policy. Let's do our work. We did our work; we did our due diligence. We engaged interested parties. We worked in a bipartisan way all the way through this bill. I've been working on this bill for four years. In 24 hours the administration blew it up.

I do not agree with the administration's changes to my bill, and I ask you to join me in nonconcurrence with the Senate changes.

(Ex. C at 8-10, Aug. 21, 2015 Mot. for Prelim. Inj.)

{¶ 60} Representative Lepore-Hagan of Youngstown also rose on the House floor to speak against concurring in the Senate's amendments:

REP. LEPORE-HAGAN: I rise in opposition to this bill in this current form. While I still believe in its original intentions of House Bill 70, I cannot in good conscience support a bill with this amendment attached to it.

What started out as an organic community based plan for our children's futures has really been turned on its head and perverted by a fast track, heavy handed takeover of

Youngstown city schools. The total loss of the citizens' right of local control. I have concerns about the process and the content of this amendment and how it was rushed through at the last minute with no involvement from the legislative delegation or the community.

We spent six months discussing the Cleveland plan, four months discussing the Columbus plan, and now here we stand given less than 24 hours to review a 66-page amendment that had one brief public hearing this morning. This is now the major policy for education? This is the change.

At the 11th hour, we're asked to consider an amendment to a bill that received wide bipartisan support when it left the chamber. This amendment was not vetted in the house because we had no hearings on the amendment and yet we are expected to concur.

Members had three years to consider the community learning center models and many in this chamber visited the Cincinnati schools to see first hand how the wraparound services can change the lives of a community, its students and it's [sic] the school, and it's [sic] an overwhelming success and the development from the ground up opposite of the language that is in the amendment.

We need to respect the fact that education decisions should be made in consultation with parents, the teachers, regional lawmakers, business leaders, local and elected officials. And in the coming weeks, I intend to continue to hold my meeting with community leaders in Youngstown to discuss implementing a community learning center in Youngstown.

But today this fast track creates a slippery slope that ends up being a slow transition to a dissolution of a school district, forcing Youngstown city school kids to failed charter schools. Our kids in Youngstown deserve a more deliberate and thorough process for a plan that enables them to succeed, not a plan that plans on their failures.

* * *

I urge a no vote, Mr. Speaker, on the concurrence of the Senate amendment.

*Id.* at 11-13.

{¶ 61} The absence of an opportunity to adequately consider the Senate's amendments to H.B. No. 70 is illustrated by the fact that another member of the House of

Representatives, Representative Phillips,  rose to ask a question, observing, "I'm reading the synopsis of Senate amendments, and obviously we don't have the actual language of the amendments before us, and there are a couple provisions in here that seem very sweeping to me and somewhat different from what you stated previously, specifically how widespread this might be."  (Ex. C at 13.)

{¶ 62}  The leeway given the General Assembly by this Court's majority in *Linndale* was misapplied by the trial court in the circumstances faced by Youngstown. Boiling down this assessment to understandable terms, it could be said that the General Assembly figuratively drove an 18-wheel tractor-trailer rig through a mouse hole we left it under our holding in *Linndale*.  This is why I would look instead to the dissent in *Linndale* in applying the Supreme Court's holding in *Voinovich*.

{¶ 63}  The language of the dissent in *Linndale* is both salient and prudent as it looks to "the underlying purpose of the three-consideration provision, which is 'to prevent hasty action and to lessen the danger of ill-advised amendment at the last moment.  The [three-consideration] rule provides more time for publicity and greater discussion and affords each legislator an opportunity to study the proposed legislation, communicate with her or her constituents, note the comments of the press and become sensitive to public opinion.' "  *Voinovich* at 233-34, quoting *Hoover* at 8 (Douglas, J., concurring). The trial court erred since this scenario is precisely what did not occur with Am.Sub.H.B. No. 70.  The facts in evidence show that the trial court abused its discretion in finding as a matter of law that the General Assembly adopted Am.Sub.H.B. No. 70 in accord with the three-reading rule of Article II, Section 15(C) of the Ohio Constitution.

{¶ 64}  *Voinovich* makes it clear that process is important to substance, and the dissent in *Linndale* emphasized this principle:

> [T]he three readings in the House occurred within a few weeks, specifically, November 12, November 27, and December 5, 2012, and the three readings in the Senate occurred over eight days. As set forth in the majority's decision, HB No. 606 was first read in the Senate on December 6. On December 11, the bill was read for the second time and referred to the Senate Committee on Judiciary. Two days later, December 13, the bill with amendments was read in the Senate, and the Senate passed it on the same day. The following day, the House concurred in the Senate

amendments. Hence, there is no indication that both chambers deliberated the amendments for any length of time. Additionally, there is no indication in this case that any debates or hearings occurred as the amendments to H.B. No. 606 were read in the Senate on December 13, and, by the following day, it had passed both the House and the Senate without any reading of the amendments having occurred in the House. Nor is there any indication in the record that this matter was given any publicity so as to stimulate any debate, as was the case in Voinovich.

*Linndale* (Sadler, J., dissenting at ¶ 6). There was no time under these facts to accomplish the purpose of the three-reading rule, which, according to *Voinovich,* is "to provide time for publicity, discussion, and an opportunity for legislators to study the legislation and confer on the issues." *Id.* (Sadler, J., dissenting at ¶ 7). As with enacting the mayor's court provision in *Linndale,* the Senate action on H.B. No. 70 was "not only swift but also unanticipated." *Id.* Even if I were to agree, and the evidence does not support this, that the House and Senate versions of the bill shared a common purpose or relationship, I cannot conclude that the purpose of the three-reading rule was met and that no violation of the rule occurred in Youngstown's case.

{¶ 65} I would distinguish this conclusion from the decision of the majority in *Linndale* based on the fact that the action of the General Assembly in Youngstown's case was even more drastic and less open to public debate than what occurred in *Linndale.* Am.Sub.H.B. No. 70 was reported out of the Senate Education Committee to the Senate Rules Committee, submitted to a vote of the full Senate, amended by the full Senate, referred to the House and considered by the House, which concurred in the Senate's amendments, all in the same day, June 24, 2015. This does not pass muster. Applying the procedural considerations of the three-reading rule of *Voinovich* to Youngstown, I cannot say that Am.Sub.H.B. No. 70 received three readings by each chamber of the General Assembly in keeping with *Voinovich's* interpretation and application of the three-reading rule found in Article II, Section 15(C) of the Ohio Constitution. The trial court's finding that "there was an opportunity to study and debate amended HB 70" is counter indicated by the record, which is replete with evidence of how the process by which Am.Sub.H.B. No. 70 was enacted stymied the underlying purposes of the three-reading rule and thwarted the constitutionally provided safeguards of "publicity, discussion, and an

opportunity for legislators to study the legislation and confer on the issues." *Linndale* (Sadler, J., dissenting at ¶ 7); (Decision & Entry at 9.)

{¶ 66} The trial court had before it uncontested evidence of vociferous objections and extraordinary efforts made by legislators to stem the precipitously swift passage of this bill without the necessary public debate. In my view, it erred when it determined from that evidence that there was ample opportunity to study and debate the bill. I would thus find that the trial court abused its discretion in finding that each chamber of the General Assembly satisfied the constitutional mandates of the three-reading rule.

{¶ 67} Youngstown does have a likelihood of success on the merits of this claim. Because this failure by the General Assembly in and of itself is fatal to the vitality of the legislation, I would decline at this time to discuss the other issues raised by Youngstown concerning the right of electors of the school district to determine the number and organization of the board of education pursuant to Article VI, Section 3 of the Ohio Constitution. I would also decline at this time to discuss Youngstown's Equal Protection Claims concerning the electors' voting rights or dilution of them. I would conclude that the process by which Am.Sub.H.B. No. 70 was adopted violated the three-reading rule is unconstitutional and as such must be severed from the bill. Accordingly, I would sustain Youngstown's first assignment of error.

## C. Second, Third and Fourth Assignments of Error

{¶ 68} The likelihood that Youngstown will prevail on the merits of its claim that Am.Sub.H.B. No. 70's adoption violated the three-reading rule weighs heavily in favor of Youngstown's entitlement to the preliminary injunction. However, in determining whether to grant injunctive relief, no one factor is dispositive and all four factors must be balanced. *Escape Enters., Ltd.* "The four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met." *Michigan Bell Tel. Co. v. Engler*, 257 F.3d 587, 592 (6th Cir.2001). Notwithstanding this balancing approach, however, the likelihood of success and irreparable harm factors predominate. *Cummings v. Husted*, 795 F.Supp.2d 677, 686 (S.D.Ohio 2011).

{¶ 69} Because of this balancing requirement concerning the four factors and Youngstown's likelihood of success on the merits, I would consider Youngstown's second, third, and fourth assignments of error together—the irreparable harm that may befall Youngstown without injunction (second assignment of error), the harm to third parties as

balanced against harm to Youngstown (third assignment of error), and the public interest (fourth assignment of error). The evidence at the hearing is for the most part relevant to all of these three assignments of error and accommodates their being considered together.

{¶ 70} Youngstown claims that, without the requested injunctive relief, it will suffer a complete disruption in operation, the elected school board's authority will be eliminated, and the administration of the school district and the education of the students will be disrupted. Youngstown argues that the Youngstown public educational system and its students need stability, which will be denied them without injunctive relief:

> The school district has been under the direction of an academic distress commission for the past five years, setting the foundation for academic improvement. Without a preliminary injunction, the appointed CEO has the power to change everything. The CEO can establish a new curriculum and choose new materials, terminate existing employees, and reconstitute and close the schools – all while this lawsuit is pending before the Court. If the Court, then, [sic] determines that [Am. Sub.] H.B. No. 70 is unconstitutional and invalid, the school system, once again, has to reorganize, causing more years of disruption to the education of the children in the district. Pending judicial review, the status quo is the better alternative.

(Mot. for Prelim. Inj. at 13.)

{¶ 71} Youngstown posits that a CEO-devised and driven improvement plan could include any or all of the following:

> [1.] Reconstituting schools for the 2016-2017 school year (R.C. 3302.(H)(1);
>
> [2.] Closing schools for the 2016-2017 school year (R.C. 3302.10(H)(1));
>
> [3.] Replacing school administrators, teachers, and staff for the 2016-2017 school year (R.C. 3302.10(H)(1));
>
> [4.] Re-opening collective bargaining agreements (R.C. 3302.10(H)(1));
>
> [5.] Encouraging students to enroll in schools outside of the district including private schools and charter schools (R.C. 3302.10(G)(3).

(Youngstown's Amended Brief at 35-36.)    Youngstown asserts that the CEO's improvement plan has the potential to "disrupt progress just beginning to come to fruition after years of effort" and "result in significant job loss and the closure of all or part of the public school system," all consequences that cannot be undone.  *Id.* at 36.

{¶ 72} Youngstown presented evidence via school district officials about the harm that will befall the district if Am.Sub.H.B. No. 70 were later declared to be unconstitutional. The interim superintendent of the school district compared the district's situation if Am.Sub.H.B. No. 70 were overturned after implementation to a rock rolling down hill, observing that one cannot start pushing that rock back up the hill until it stops going down.  He acknowledged that he could not speak to all the ramifications that implementing Am.Sub.H.B. No. 70 could have on the district, primarily because he had yet to hear officials of Ohio provide a consistent explanation of the Act.  The interim superintendent testified, however, that the damage would be irreparable, stating, "[i]f you give away schools, if you fire people, how do you take that back?"  (Tr. Vol. I at 384.)  The interim superintendent likened undoing the implementation of Am.Sub.H.B. No. 70 to "put[ting] the toothpaste back in the tube."  *Id.*

{¶ 73} Ohio challenges Youngstown's claim.  Ohio argues that the district operations already are, and have been, so disrupted that the district cannot adequately administer itself or educate its students.  Ohio presented evidence of the district's chronic poor performance in several areas, including student enrollment, student success, and financial operations for the past ten years, which includes the five years the district has been under the direction of an academic distress commission pursuant to former R.C. 3302.10.  This explanation is the reason for Am.Sub.H.B. No. 70, not an excuse for the disruption forced on Youngstown by Ohio without the constitutionally provided safeguards of "publicity, discussion, and an opportunity for legislators to study the legislation and confer on the issues."  *Linndale* (Sadler, J., dissenting at ¶ 7).

{¶ 74} Regardless, Youngstown counters that the district shows recent improvement. Youngstown points to successes obscured in the seemingly bleak achievement data for the Youngstown City School District's 2013-2014:

> Hidden in this bleak news is the fact that the District raised passing percentages on state assessments in 14 of 22 rated academic areas. Though subpar, the graduation rate is slowly increasing, college acceptance rates are on the rise, and in

> buildings where teaching and leadership staff have embraced the tenets of the Quaglia program to improve school culture through enriched student-teacher and student-student relationships, violence is down and suspensions and expulsions have decreased.
>
> * * *
>
> Finally, the [Youngstown Academic Distress Commission] depended heavily upon the previous plan. The District has been challenged to make several changes in the past two years, and those changes need time to settle into the fabric of the District and the schools. Reference was made in the ODE review of what is commonly called "initiative fatigue," a common occurrence in districts that are desperately trying to discover and deploy initiatives that will work to turn around failing schools. Often times in education, promising changes initially generate only moderate or even minimal improvements and are abandoned as unsuccessful too soon. This revision of the [Academic Recovery Plan] contains few, if any, surprises and reflects an intent to keep forging ahead with the strategies of the prior plan and to improve monitoring and assessment efforts that focus on what is and is not working in the District.

(Ex. 14b at 2-3, Sept. 29-30, 2015 Hearing.) Youngstown presented evidence that changes for an entire school district are likely to be incremental and slow and that such changes are often abandoned too soon, imperiling success rather than strengthening resolve to keep going. This evidence supported the strength of the public interest in the status quo as opposed to yet another change imposed by legislation aimed at Youngstown adopted by constitutionally infirmed procedures.

{¶ 75} Youngtown City School District Interim Superintendent Stephen Anthony Stohla testified that he took up his position around the time Am.Sub.H.B. No. 70 was enacted. The enactment had surprised him because he soon determined that the district was doing "a lot better" than it had in 2010, when he last worked in the district. (Tr. Vol. I at 367.) Stohla testified that the district was experiencing a financial turnaround; whereas, the district had projected in April 2015 a $48 million deficit at the end of 2020, it now was projecting a $23 million surplus by the end of 2020. He attributed this turnaround in part to school district changing health insurance plans. The interim superintendent described improved math and literacy test scores and increased participation in college preparation courses. He praised the school district's handling of

the opening of the 2015-2016 school, notwithstanding an opening day that he characterized as "chaotic." *Id.* at 378. Stohla stated that he was astounded at how well the first two months of the school year had gone, given that the district's superintendent, deputy superintendent, director of human resources, and approximately 20 percent of staff had resigned before the new school year commenced. He credited Ohio Department of Education with helping the district fill many of the vacancies in teaching positions. He highlighted the stability of principals assigned to the district's 13 schools, noting that it was a good starting point for the district.

{¶ 76} Brenda Kimble, president of the Youngstown City School District Board of Education, testified about her positive relationship with the academic distress commission created in 2010 under the former version of R.C. 3302.10. Kimble opined that Am.Sub.H.B. No. 70's enactment sent a message to the board of education and to the community that they "don't count." (Tr. Vol. I at 266.) Kimble described programs in academics and the arts that offer the district's 5,400 students opportunities not available in nearby school districts. She testified that Am.Sub.H.B. No. 70's implementation could spell the end to those opportunities, leaving the students with nowhere to go, a concern for parents as well as students and educators. Kimbel discussed the team-building program in place in each district school that gives students a voice and a choice. Kimble testified that education in the district is on an upswing but that stability is required to maintain it. She offered the following explanation to the trial court:

> Why I believe [that stability is important to the school district] is because there has been so many changes in the past few years from the state with curriculum and testing, it doesn't give our students a chance to grasp anything or the teachers a chance to know what to teach.
>
> And now we have programs that are working in our district. We have programs that the students are understanding. We have support programs that they're helping our students move forward and we need to be stable at this point. We need to be stable again so that teachers can teach, they can do their jobs and the students can grasp what's being taught.

(Tr. Vol. I at 277.) Youngstown demonstrated through this testimony the potential for irreparable harm to the students and teachers of the district.

{¶ 77} Ohio cites potential harm to the students of the school district as the basis of its claim for potential for harm to third parties. A consideration of preliminary injunction calls for a balancing of interests between the party seeking the injunction and third parties. Both sides are urging there will be harm to students, one side saying it will occur by not granting the injunction and the other side saying it will occur by granting it. Youngstown argues not only for its students but also for its teachers. ("We need to be stable again so that teachers can teach, they can do their jobs and the students can grasp what's being taught." (Tr. Vol. I at 277.)). Based on the evidence adduced before the trial judge, I would find as a matter of law that the balance tips in favor of Youngstown on the issue of harm to the students of the school district.

{¶ 78} Children do not remain static while the various cohorts of the educational community struggle against one another for the emergence of a "better" plan to improve their educational performance, taking into account all good intentions. The reality is that Youngstown presented clear and convincing evidence that stability is prudent in protecting the educational interests of Youngstown and its students. In short, Youngstown presented clear and convincing evidence of the analogy that leaving some sailors on the proverbial deck of a leaking ship is preferable to a "clearing of the deck" when the leak appears to be abating. At the very least, a preliminary injunction that preserves the status quo will not exacerbate an already bad situation. The potential for irreparable harm to Youngstown weighs more heavily than the claimed harm to third parties if injunction is not granted while the trial court fully hears the claims of the parties.

{¶ 79} The evidence before the trial judge was clear and convincing that denying the requested injunctive relief would cause immediate and irreparable harm to Youngstown's school students and teachers. Balancing the hardships created with and without injunctive relief, I would find as a matter of law that the trial court abused its discretion in finding from the evidence that denying the preliminary injunction would not likely result in immediate and irreparable harm for Youngstown, its district and its student population, and that the harm to third parties would outweigh the harm to Youngstown. I would sustain Youngstown's second and third assignments of error.

{¶ 80} As to the fourth assignment of error, Youngstown claims that the trial court erred in finding that the public interest will not be served by the requested injunctive

relief. The record before the trial court contained evidence that the public does have interests in being effectively served by its public education system, such that the public "has an interest in having schools that are effective and that are properly educating students." (Decision & Entry at 15.) Youngstown's previous factual arguments encompassing stability and incremental improvement over time support its request for injunction with clear and convincing evidence. I would hold that the trial court erred in finding that, "[t]he General Assembly found that Am.Sub.HB 70 serves these interests in public education" when it found that Youngstown had not "proven that the public interests will be served by the injunction." *Id.* Because I would sustain Youngstown's first assignment of error, holding that the trial court erred in determining that Am.Sub.H.B. No. 70 was constitutionally enacted, I would also hold that the process by which the General Assembly adopted Am.Sub.H.B. No. 70 is a matter of public interest for which injunction was proper.

{¶ 81} Article I, Section 20 of the Ohio Constitution provides, "[t]his enumeration of rights shall not be construed to impair or deny others retained by the people; and all powers, not herein delegated, remain with the people." It is well established that this provision makes the Ohio Constitution a document of delegated powers. *State ex rel. A. Bentley & Sons Co. v. Pierce*, 96 Ohio St. 44 (1917). It also expressly excludes from the General Assembly the exercise of power that is not delegated to it in the constitution. *State ex rel. Robertson Realty Co. v. Guilbert*, 75 Ohio St.1 (1906). I would hold that sustaining Youngstown's first assignment of error is proper because of the conclusion that the process under which Am.Sub.H.B. No. 70 was adopted violated the three-reading rule of Ohio Constitution, Article II, Section 15(C). As such, I would find that the General Assembly's action in this matter also violated Ohio Constitution, Article I, Section 20 because that action was an exercise of power not delegated to it in the constitution.

{¶ 82} The record indicates that Youngstown and other persons had an interest in Ohio following the three-reading rule in adopting Am.Sub.H.B. No. 70. The enactment of statutes proposing to overhaul aspects of Ohio's education process constitutionally requires "publicity, discussion, and an opportunity for legislators to study the legislation and confer on the issues." *Linndale* (Sadler, J., dissenting at ¶ 7). On balance, the public's interest in having Ohio follow the three-reading rule in this case supersedes Ohio's interest in forcing the unconstitutional passage of Am.Sub.H.B. No. 70.

{¶ 83} Accordingly, I would find that the trial court abused its discretion in finding that Youngstown did not prove that the public interest will be served by the granting of a preliminary injunction. Accordingly, I would sustain Youngstown's fourth assignment of error.

## V. CONCLUSION

{¶ 84} I would find that this Court has jurisdiction to hear Youngstown's appeal for the reasons aforementioned. I would further find that the trial court abused its discretion in finding that Youngstown had failed to prove all four preliminary injunction factors and, consequently, in denying Youngstown's motion for preliminary injunction. I would, therefore, sustain Youngstown's four assignments of error, but I would hold that Youngstown's first assignment of error is sustained only as to its argument concerning the three-reading rule contained in Article II, Section 15(C) of the Ohio Constitution. I would hold that Youngstown's other arguments presented concerning the first assignment of error are moot for now. Therefore, I would reverse the judgment of the Franklin County Court of Common Pleas and remand this matter with instructions to grant a preliminary injunction to Youngstown consistent with this decision.

_____